ORIGINAL

No, 07-cv-355-SLR

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



GABRIEL G. ATAMIAN,MD,MSEE,JD
APPELLANT,

v.

U.S.DEPARTMENT OF EDUCATION
and SECRETARY OF U.S.
DEPARTMENT OF EDUCATION,
APPELLEES.

---

ON APPEAL TO THE UNITED STATES DISTRICT COURT OF
DELAWARE FROM THE BANKRUPTCY COURT

---

APPENDIX
to the
APPELLANT'S OPENIND BRIEF

---

Gabriel G. Atamian,, BA,BS,MA,MD,MSEE,MS,JD
1021 N. State Street Apt A
Dover, DE 19901
302-678-2546

Table of Contents

1. First Amended Complaint                                    A-1

2. Answer to the First Amended Complaint                      A-21

3. Debtor's Interrogatorries to defendant                     A-24

4. Response to Debtor's Interogatorries by defendant          A-49

5. Debtor's Motion to Compel Interrogatorries                 A-51

6. Debtor's Motion for Protective Order                       A-55

7. Stipulation drafted by defendant                           A-58

8. Letter by Dr. Gorgon Christensen                           A-61

9. Psychiatry Diploma with Honors                             A-65

10. Total earning by Debtor                                   A-67

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:  Gabriel G. Atamian,MD,MSEE,JD

        Debtor

:

:

:  Chapter 7

                            Plaintiff,

: Case No.  05-20040-MFW

v.

    U.S. Department of Education; and
    Secretary of U.S. Department of Education;

:

    Johns Hopkins University; and,

: Adv. Proc. No. 06-50435-MF

    Signet Bank,

                Defendants.

Hearing date    July 26, 2006 at 2:0

FIRST AMENDED COMPLAINT

COMES NOW plaintiff Gabriel Atamian,MD,MSEE,JD, and moves the

Court pursuant to the Court's decision and Order, during the

hearing , on June 2, 2006, permitting plaintiff to amend his

complaint for the first time.

The amendment consit only by substituting the defendant "National

Payment Center" to "U.S. Department of Education; and, Secretary of

U.S. Department of Educational."

    The amendment is  no way prejudicial to the defendants.

    Attached hereto as Exhibit A, is the first Amended Complaint.

                           Respectfully submitted,

                           Gabriel G. Atamian, MD, MSEE,JD

                           Gabriel G. Atamian,MD,MSEE,JD
                           1021 N. State Street Apt A
                           Dover, DE 19901
                           302-678-2546
                           Plaintiff. Pro se

June 9, 2006

A-1

Exhibit A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:   Gabriel G. Atamian,MD,MSEE,JD                     :

             Debtor

                                      :   Chapter 7

             Plaintiff,             :   Case No.   05-20040-MFW

v.

U.S. Department of Education; and         :
Secretary of U.S. Department of Education;
                                 :  Adv. Proc. No.  06-50435-MF
Johns Hopkins University; and,

Signet Bank,
             Defendants.       Hearing date   July 26, 2006 at 2:0(

## FIRST AMENDED COMPLAINT

### COMPLAINT TO DETERMINE DISCHARGEABILTY OF STUDENT LOAN

1.    Debtor filed this case under Chapter 7 of the Bankruptcy Code on November 15, 2005. This Court has jurisdiction over the action under 28 USC § 1334. This proceeding is a core proceeding.

2.    The unsecured debts owing by the Debtor and listed on Schedule F-Creditors Holding Unsecured Nonpriority Claims - is a student loan

owing to :   i. National Payment Center;
            ii. Johns Hopkins University;
            iii. Signet Bank.( not listed on Schedule F)

3.   These loans were incurred to pay expenses at Johns Hopkins University.

4.   Based on the Debtor's current income and expenses , the Debtor cannot maintain a minimal living standard and repay the loan. Debtor is a retired 70 years indigent who lives on social security benefits and also on food stamps. Moreover, see, jewish conspiracy which is well illustrated in the Complaint, pp 3-18 , infra.

A-3

5.   The Debtor's current financial condition is likely to continue

for a significant portion of the repayment period of the loan.

Debtor is a 70 years retired indigent person who lives on food stamps

and medicaid. Moreover, jewish conspiracy of taking Debtor for an

"Arab", has ruined the entire life of the Debtor since 1965, see infra,

of this Complaint, pp. 3-18.

6.   The Debtor have made a good-faith effort to repay his debt as

follows:   Debtor introduces two Appendixes which will prove that

the jewish conspiracy for taking Debtor for an "Arab" has prevented

Debtor to be employed since 1982. Appendix I, which is the genesis

of the conspiracy by the jewish physicians since 1965. The Appendix II,

is the curriculum vitae of the Debtor which reveals that the Debtor

has earned 10 advanced degrees.

The genesis of the conspiracy by the jewish physicians is a

pertinent evidence to the Bankruptcy Court due the fact that Debtor

was not able to earn any income since 1982, even though he does

posses 10 advanced degrees.( See Appendix I, A-72)

7.   The Debtor has filed for bankruptcy for reasons other than just

discharge his student loan. Such as, pursuant to Section 1109(b)

Bankruptcy Code, Debtor may raise and may appear and be heard on

any issue in a case under this chapter. (see Bankruptcy Rule 7024

Intervention by the Court to designate a Christian Master to find

out why the Debtor has not been able to earn an income since 1982,

due to the jewish conspiracy. Moreover, to find out that since 1979,

Debtor's dental conditions are not treated, Debtor is in constant

pain because of swollen gums due make-believe treatments of his

dental problems.

2

A-4

## COMMON LAW CONSPIRACY

Plaintiff will describe in a chronological sequence and proof that the jewish physicians from NYC , since 1965, have taken plaintiff for an "Arab" and have destroyed plaintiff's entire life.

**CHRONOLOGICAL EVENTS AND FACTS OF CONSPIRACY AGAINST PLAINTIFF BY THE NYC JEWISH PHYSICIAN FROM 1965 until today**

**I.   Labeling by Dr. Naftalin , on 1965.**

One month before my graduation from the medical school, on 1965, Dr. Naftalin who survived the German Concentration Camp,[A-7] [1][2]

---

(1)   Attached hereto is Appendix I which contains the genesis of the conspiracy of the jewish physicians against Plaintiff since 1965

(2)   Also, attached hereto as Curriculum Vitae of Gabriel G. Atamian,MD,MSEE,JD

3

A-5

who was a psychiatrist in the medical school, coined plaintiff with the label of:"Bizarre behavior, emotionality and need of psychothe-rapy."

It is very important to note that Dr. Naftalin did not know me at all. Plaintiff has never met Dr. Naftalin .

Furthermore, in order to be graduated from New York Medical College, on 1965, plaintiff was send to the Immigration and Natura-lization Department , to denounce his Syrian citizenship and acqui-re the status of Stateless. Plaintiff not being an "Arab", did not mind at all to be a Stateless individual. So, plaintiff did procu-re his green card before graduation in order to be graduated from the medical school.

## II.   FROM 1969 to 1979, WHEN PLAINTIFF WAS IN NEW YORK CITY

On March 28, 1969, my beloved brother was killed on the Highway of Massachussetts, while plaintiff and his brother were fixing their parked car.

A jew from NYC , hit our parked car, and my brother was muti lated in that so called "Unfortunate coiencidence".

From 1970 until 1979 , plaintiff was drifted to NYC.

Jewish Physicians made a fictitious diagnosis of Lou Gueric Disease on plaintiff, on 1971. Plaintiff was literally on the Death Row, for $7\frac{1}{2}$ years, because Lou Gueric Disease is a fatal disease. The above facts are clearly described in letter send to the Board of Medicine of Virginia, on June 1, 1985. (See A-7 and A-8)

A-6

III.   From 1979 until 1985 . THE PERIOD WHERE PLAINTIFF APPLIED
FOR LICENCE TO PRACTICE MEDICINE IN ARIZONA, DISTRICT OF COLUMBIA
AND VIRGINIA.

On June 1979, plaintiff left NYC and went to Arizona. The
Board of Medical Examiners in Arizona ordered a physical examina-
tion and a mental examination for the plaintiff, after having re-
ceived the record from Manhattan State Hospitalfor the plaintiff.

It is very ironical for the plaintiff, when the Manhattan
State Psychiatric Hospital, grants a Diploma with Honors in Psychia-
try to the plaintiff after successfully finishing the psychiatry
residency , and, and then turns around through 'unlawful act' sends
an untruthful record to the Board of Medical Examiners of Arizona,
about plaintiff. The above act, by the jewish physician from NYC,
is an overt act of conspiracy.

The same tactic happened in the District of Columbia, on
1980-81, while the plaintiff was an instructor of Physical Medicine
at Howard University Medical Center, the Department did require
for a license to practice medicine in the district of Columbia.
:   The plaintiff applied for the license in the district of Colum-
bia. The Board of Medical Examiners after numerous correspondance
with the State of New york, did order the plaintiff to take a
mental examination.

The same routine happened with the Board of Medical Exami-
ners of Virginia, 1985, where the Board in an informal meeting,
ordered physical and mental examination of the plaintiff. This time,
plaintiff was  aware of the conspiracy, therefore choose to surren-
der his medical license to the Board of Medical Examiners of Vir-
ginia, by his own volition, in other words, voluntarily. (See A-7 to
A-10)

5

A-7

Couple days later, after plaintiff's voluntary surrender
of license, plaintiff receives a letter from New York State Licen-
sure Department, Albany, NY. Plaintiff contacted by telephone to
the sender of the letter who told plaintiff that:" Plaintiff has
a license in medicine for life in New York, and plaintiff should
return back to New York."

In summary, all the above orders of the mental examination
of plaintiff issued by the Boards of Medical Examiners for licensu-
re of the States of Arizona, District of Columbia and Virginia ,
were orchestrated by the jewish physicians from the Manhattan
State Hospital of the State of  New York, by forwarding to the
Boards untruthful record or fabricated reco rd about the plaintiff.[3]

Attached hereto is the Diploma with Honors in Psychiatry
accorded to plaintiff, with special comments by Edward J. Hornick,MD,
Chief of Psychiatry. (See A-73 and A-74)

---

[3] In the procurement of a license to practice medicine in any
state, the custom or the procedure is to inquire information
about the applicant from the state that the applicant was practi-
cing medicine , before leaving that state.

A-8

IV.    FROM 1981 to 1995, PLAINTIFF HAS SEEN Dr. DuPONT ,
       A SPECIALIST IN BEHAVIORAL MODIFICATION MEDICINE.

Plaintiff went to Dr. DuPont [4] , on November 1981, for

his phobia and the consequences of phobia of not being able to per-

form well sexually.

From 1981 until 1985, Dr. DuPont has not kept a record

about plaintiff. But, since 1985, it is very strange , that after

the voluntary surrender of plaintiff's license of medicine,  Dr.

DuPont has kept an extensive record( including colateral records

which has nothing to do with plaintiff's phobia). Dr. DuPont has

acted as a private investigator (detective) rather than a psychia-

trist.

Dr. DuPont's record can be contrued has follows:

a. from 1981 to 1985, no record kept.
b. from 1985 to 1987, an extensive record about plaintiff is made by Dr.
DuPont. This period was when plaintiff voluntary surreder his license
and attended Maryland University for electrical engineering.
c. From 1987 to 1995, an extensive record is made, this was the period
of the cover-up of my beloved mother's murder . Dr. DuPont has tried
very hard to make plaintiff crazy (paranoid).

On August 7, 1998, plaintiff has learned through discovery,

for the first time, plaintiff has become aware and informed about

the content of Dr. DuPont's record about plaintiff.

a.   Note of Dr. DuPont on 8-9-85(See A-11)

My  name is mis-spelled: Gabrial Atamanian

the note states:

"He not practice medicine or seek to get his license back"

---

[4] Dr. DuPont is not a member of the famous family in Delaware, known
as duPont.

b. Note of Dr. DuPont on 6-28-85 (A-12)

My name is mis-spelled : Ataminian.

The not states;
" I also suggest  he not pursue his license in DC but that he
focus on non-clinical activities.."

c. Note of Dr. DuPont on 4-8-86 (A-13)

My name is mis-spelled: Gabrial, Atamanian.
The note states:
" I said I thought it was fine as long as he played a technical role,
not the role of the clinically repsonsible phycisiian."

It should be noted that the Notes (a), (b) and (c) , are before my beloved mother's
murder by the jewish physician on 6-1-87.

d. Note of Dr. DuPont on 8-20-87 (A-15)

" In   charge of patient relations for Adventist hospital
Said Dr. Atamian is "obviously parnaoid" and often disruptive but
that he responds to their being firm with him.
Concerned about the impact on him of the probable death of his
mother."

It is , also, very important to note that in the progress

note of plaintiff's beloved mother at Washington Adventist Hospi-

tal, on 6-19-87,the medical social worker, States (See A-14):

" Unit staff states son has Dx Schizophrenia.... receiving psychiatric
follow up."

e. Note of Dr. DuPont on 9-4-87 (A-16)

The note states:
"I spoke last night and this afternoon at lenght toAgt Vermillion
of the Secret service. Office 634-5100 and home 703-620-4773. He was
supportive but indicated Dr. A was not committable in his view."

Again, Dr. DuPont wanted to make me crazy(involuntary
committable), but the Secret service indicated that Dr. Atamian
was quite appropriately with them, and was not committable in
his view.

f. Note of Dr. DuPont on 1-14-90 (A-18)

The note states:
" but I told her I doubted he could get a state license in
California, or in any state."

8

A-10

g.  Note of Dr. DuPont on 7-12-91 (A-19)

Again my name is mis-spelled: Gabrael, Gargiel. [5]

The note states:

" I told her I did not think he could get a license anywywhere to
practice medicine."

From (a) to (g), Dr. DuPont states that plaintiff cannot
practice medicine. However, please see note (h), infra.

h. Note of Dr. DuPont on 1-21-92 (A-20)

This is an interesting note which states:

" I proposed that we work to get his Maryland medi al licnseback
noting he'd have to drop public expressions of his antisemitism and
have diagnosis of paranoia (hot phobia)

Suddenly, Dr. DuPont somehow or rather has changed his
opinion , and states that plaintiff can have a license and can
do clinical work. From (a) to (g) , Dr. DuPont has emphatically
stated that plaintiff cannot and should not practice medicine.

Moreover, it is very interesting to notice, that Dr.
DuPont is selling plaintiff the diagnosis of paranoia. Or,
in a subtle manner, Dr. DuPont is forcing plaintiff to accept
the diagnosis of paranoia.

Plaintiff, having a psychiatry Diploma with Honors, is
suprised to see and witness such a  nonprofessional conduct.

It is , also, very important to note that Dr. DuPont's
note on 8-31-89(See A-17), the Dx is: DSM-III 300.02, which is
chronic anxiety. Dr. DuPont in the entire encounter with the plain-
tiff never ever mentioned to plaintiff that plaintiff's Dx is
paranoia.

_____

(5) It is very important to note that from the voluminous record of Dr.
DuPont, in each note or approximately in each note Dr. DuPont has mis-spelled
plaintiff name. Plaintiff, being himself a psychiatrist believes this is an
unconcious resentment against plaintiff .

9

A-11

## V. THE GENESIS OF THE CONSPIRACY AGAINST PLAINTIFF BY THE JEWISH PHYSICIANS FROM NEW YORK CITY.

Plaintiff in the Appendix A-66 to A-71, has illustrated the genesis of the conspiracy against him by the jewish physician from new york city.

Plaintiff descibes on p. A-66, how plaintiff's parents who were Armenians from Turkey, who after the massacre by the turks in 1914, plaintiff's parents immigrated to Syria. And , how his mother was raised in an orphanage in Syria by the American Protestant Missionary. The Americans came to Syria for the purpose of caring the Armenian victims of the massacre.

Plaintiff describes that when on March 19, 1956, plaintiff came to America as a student with a syrian passport. Where, during plaintiff's training in the medical school, that plaintiff was discriminated by the Jewish Physicians. They knew about my Syrian background(Citizenship). (See A-66)

Plaintiff illustrates on p. A-67, that his entire earnings from 1956 until 1999, where it reveals that plaintiff was not able to earn an income since he left New York City on 1979.

Plaintiff descibes on p. A-67, that couple days later, after plaintiff's voluntary surrender of license, plaintiff receives a letter from New York State Licensure Department, Albany, NY. Plaintiff contacted with telephone to the sender of the above letter who told plaintiff that:" Plaintiff has a license in medicine for life in New York, and that plaintiff should return back to New Yok."

10

A-12

VI.   ON JUNE 1, 1987, PLAINTIFF'S BELOVED MOTHER WAS MURDERED
AT WASHINGTON ADVENTIST HOSPITAL BY A JEWISH PHYSICIAN.

Plaintiff has described, the following:

a. A-21 to A-34, in a lay person terms, the murder of his beloved mother.
b. A-35 to A-56, in somewhat medical terms , the murder of his beloved
mother.
c. A-57 to A-65, plaintiff has described the spoilage of his mother
   medical record.

Plaintiff is adding the following citations from the medical

literature :

i.   A PHYSICIAN NEVER USES 37.5 mg  OF CAPTOPRIL ON AN ELDERLY
WOMAN OF 80 YEARS WITH CONGESTIVE HEART FAIRLURE AND DIURETICS
AND NITROPASTE ON BOARD.

1. The Report of the Joint National Committee on Detection , Evaluation,
and Treatment of High Blood Pressure, Arch. Intern. Med.- Vol. 148,
May 1988, on p.1034, states (See A85 and A-86):

"  elderly Patients

ACE inhibitors( meaning captopril) are useful as
monotherapy in elderly patients."

2. Reid Jl, Angiotensin converting enzyme inhibitors in the elderly,
British Medical Journal, Vol. 295, 17 Oct. 1987, states on p. 943 and
p. 944 ( See A-87 and ana A-88):

" Hypotension is most often seen in patients also taking
diuretics or in those who are hypovolemic or hyponatraemic.
Hypotension is more common in patients with cardiac failure."

"In patients with heart failure who are taking diuretics
it is rarely practcable to stop diuretics. If they cannot be
stopped then reducing the dose for 24-28 hours before giving
the angiotensin converting inhibitor may be prudent.........
Alternatively captopril 6.25 mg may be preffered because of its
shorter duration.

Again, it should bve be noted that the dosage to start is 6.25 mg and not 37.5 mg which

is 6 times the dosage. And, the diuretics which in this case

is lasix should have been stopped, and not prescribed by Dr. Bass,

because my beloved mother had already received on May 31, 1987,

120 mg of lasix that day. (See A-40 and A-43)

11

A-13

3. In Primary care of the Elderly : A practical approach, states(See A-89):

> "Hence meddlesome attempts at blood pressure reduction may seriously threaten cerebral blood flow and decision to employ hypotensive therapy in person over 75 must be taken with extreme caution."

> "If an 80-year-old female with such symptoms is found to have a blood pressure of 180/100, it is most improbable that lowering it to 150/90 will make her more stable and, indeed, if postural hypotension is thereby induced, her balance may be made much worse."

ii. WHERE PATIENT BLOODGASES INDICATES THAT AT 2l/min flow of Oxygen, p 02 is 74 and P CO2 is 79, the flow of Oxygen should be and must be decreased from 2 L/min. to 1 L/min, in order to prevent catastrophic and tragic outcome of respiratory arrest.

Citing the medical literature:

Wilkins E W, et al., MGH Textbook of EMERGENCY MEDICINE, second edition, p. 173, states (A-90 and A -91) :

> "In clinical practice, the point at which severe hypoventilation limits oxygen therapy is highly variable and requires a cautious trial-and-error approach monitored by arterial blood-gas determinations 15-20 minutes after each adjustment in oxygen flow."

Yet, Dr. Bass choose knowingly and deliberately to prescribe 2 L/min. of Oxygen for 8 hours until respiratory arrest occured to my mother. (See A-58)

Also, see A-23, A-35, A-36, A-57 and A-58 for the deliberate induction of respiratory arrest on my beloved mother.

iii. DELIBERATE INDUCTION OF HYPERKILIMIA ON MY MOTHER.

EKG on 6-1-87, at 07:00 indicates the effect of captopril on serum potassium level.

The strip #5 (See A-44 and A-56) indicates hyperkalemia meaning serumpotassium level higher than 6.5 mEq/L. ( normal serum potassium level is 5 mEq/L). For this discussion see , also, A-42 to A-44).

12

A-14

iv.   Unnecessary therapy of aminophyline I.V. to my mother
      an 80 years old woman with right sided heart failure

My mother did not have wheezing, then why treat with
aminophylline I.V. which is a bronchodialator?  (See A-45 and A-46)

Dr. Bass in his physical examination , writes:" ......
elderly woman lying comfortably in bed........................
CHEST: No definite wheezing." (See A-47 and A-48)

ALL THE ABOVE FACTS, INDICATES THAT PLAINTIFF'S BELOVED
MOTHER WAS MUTILATED ON JUNE 1, 1987.

ALSO, IT IS VERY IMPORTANT TO NOTE THAT ON OR ABOUT 1991,
PLAINTIFF COMMUNICATED BY LETTER WITH Vincent DeQUATTRO,MD, WHO
IS MEMBER OF THE 1988 REPORT OF THE JOINT NATIONAL COMMITTEE ON
DETECTION, EVALUATION, AND TREATMENT OF HIGH BLOOD PRESSURE. (
See A-85). Dr. DeQUATTRO, WROTE TO PLAINTIFF, AND STATED:

'"IS YOUR MOTHER STILL ALIVE."

13

A-15

VII.    Dr. ROBERT A. GORKIN(JEWISH PHYSICIAN) , LABELLED PLAINTIFF
AN ANTISOCIAL CHARACTER DISORDER, MEANING A PSYCHOPATH.

Dr. Gorkin's psychiatric evaluation (See A-83 and A-84),
is an unconsented and fictitious psychiatric evaluation.

On October 12, 1995, plaintiff was hospitalized at Kent
General Hospital for an acute          stomach ulcer blee-
ding.

On October 13, 1995, Dr. Gorkin came to plaintiff to perform
a psychiatric evaluation. Plaintiff told Dr. Gorkin to 'leave plain-
tiff alone' and that plaintiff does not need Dr. Gorkin's services.

Dr. Gorkin's contact with plaintiff was only couple minutes.

Yet, Dr. Gorkin without having conducted a psychiatric
examination and interview , without having knowledge of plaintiff's
symptoms or chief complaint, without having knowledge of plaintiff's
social history and past history, and without having knowledge of
plaintiff's problems and without knowing 'anything' about plaintiff,
has written a complete psychiatric evaluation about plaintiff,
Dr. Gorkin' s diagnosis about plaintiff is antisocial character
disorder(psychopath or sociopath). Again, needless to emphasis,
that the contact of Dr. Gorkin with plaintiff was only approxima-
tely two minutes.(See A-83 and A-84)

VIII.    DENTISTS HAVE REFUSED TO TREAT PLAINTIFF'S DENTAL PROBLEMS

In the present case, plaintiff reqpectfully requests this
Honorable Court to notice the following facts:

(a)    Since, plaintiff has left NYC, on June 1979, the
New York Jewish Physician have interferred in the fabrication
of plaintiff's bridge# 3,4,5. ( See A-77)

14

A-16

(b)   On May 24, 1999, Delaware State Dental Society and Dr. Ralston, DDS, have refused to do a Peer Review regarding the dental work done by Dr. Bahar. (See A-78)

(c)   On July 27, 1999, Dr. Bond, DDS, after examining plaintiff's oral cavity and mouth, Dr. Bond refused to put in writing the dental findings. (See A-79)

(d)   On July 28, 1999, Dr. Mazoch, DDS, refused to write the report about the diagnostic impression taken on plaintiff's mouth. (See A-80) [6]

(e)   On December 27, 2000, Dr. Chialastri, DMD, informed plaintiff that she will not treat plaintiff for teeth cleaning which was scheduled by her on January 10, 2001, at 12:00 pm. (See A-81)

(f)   On November 28, 2000, Dr. Webster, DDS, refused to do a simple cleaning, scaling and root planning, of plaintiff's teeth. When, plaintiff arrived at Dr. Webster's office , Dr. Webster told that:"He(Dr. Webster) is not going to render any kind of treatment to plaintiff." (See A-81)

---

[6] Dr. Mazoch's letter dated on August 10, 1999, states that:"I do not wish to treat you as a patient and would appreciate no further contact."(See A-80)

[7] Dr. Webster extracted plaintiff's tooth#23, on or about early fall of 2000. Plaintiff paid Dr. Webster fee for extraction by the NHC card which was issued on 9-30-2000(Clinic card No.: 269380).
Dr. Webster was willing to redone all the prosthesis fabricated by Dr. Bahar, but Dr. Webster changed his mind after having received plaintiff's beloved mther medical record which does indicate beyond any doubt the murder of plaintiff's beloved mother.

15

A-17

(g)   On March 5, 2001, at 12:00 pm, plaintiff had an appoint-
ment with Dr. Jester,DDS, for oral examination and teeth cleaning.
Plaintiff arrived half an hour earlier than his appointment schedu-
led . After, having to wait one hour in Dr. Jester's office, Dr.
Jester at 1:00 o'clock, told plaintiff that :"He(Dr. Jester) is not
going to perform a preliminary examination on plaintiff's mouth,and,
also, that he is not going to perform a simple cleaning of plaintiff's
mouth and teeth."(See A-81)

(h)On April 6, 2001, Patricia M. Duca, of the Nemours Health
clinic, informed plaintiff in writing, that the clinic will not
render dental treatment to plaintiff. See A-92)

At this momoment, plaintiff introduces the waiting period
for the dnental service from the day you become a new Nemours me
member is 4-6 months(See A-6)

Plaintiff has asked numerous times from the Milford Clinic
and spoke to the manager about the waiting period, whose answer
is that : "She (managerof Milford Branch) does not know what is
happening to plaintiff's case."

Further, plaintiff has t requested , with no success, from
the Miford Clinic about the "automatically be mailed a packet shortly
after enrollment that includes the dnetal provider list for those who choose
to receive dental care through the Outreach Program. (See A-4)

The above decisions  of the defendants indicate the arbitrary and
unresasonable action by the NHC and its Officers Perry and Duca, a departure

16

A-18

from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached. See Arlington Heights v. Metro Housing Corp. 429 US 252, 50 L Ed 2d 450, 466, 97 S Ct 555.

i)    On 2002, Dr. Michael J. Ryan,DDS, case pending in Superior Court of Delaware, Case No.: 03C-12-038(RBY);

j)    On 2003, Dr. Anthony W. Vattilana,DDS, case pending in the Supreme Court of Delaware, Case No.: 354,2005.

k)    On 2004, Dr. Linda Nguyen, DDS, case pending in the Supreme Court of Delaware, Case No.: 595,2005;

l)    On 2004, Dr. James J. Gentile, DDS, the dentist's secretary, Ms. Shelly, stated: " That we will not tolerate Plaintiff's antisemitism."

m)    On 2005, refusal to treat Plaintiff's dental urgent need of dental care by DrMichael W. Martin , DDS and Dr. Christopher Burns, DDS.

n)    Also, the most important is the malicious work done by DR. Arezoo A. Bahar, DDS on Plaintiff's dentition, from 1998 to 1999.

On October 11, 2004, Dr. Christensen Affidavit (A-93 and A-94), it is about the two x-rays taken by Dr.Bahar. Exhibit A, taken on 11/24/98(A-95) and Exhibit B, taken on 12/.16/98, after three weeks(A-95).

17

A-19

On October 11, 2004, Dr. Gordon J. Christensen's Affidavit, states(A-93):

> "Assuming that Exhibit A was taken on 11/24/98 and exhibit B only three weeks later, it is very peculiar that there is significant and gross tooth destruction on exhibit B ...........If this in fact occured only three weeks it would be a major undescribable phenomenon...
>
> ... however it is very peculiar situation that I have not seen before in 45 years."

As the Affidavit of Dr. Christensen states that it is very peculiar to have gross tooth destruction in three weeks, it would be a major undescribable phenomenon. The only way to explain this peculiar phenomenon , it is done by the intentional, willfull and purposeful act of Dr. Bahar by injuring and destroying the cementum and the periodontal ligament.

WHEREFORE, Debtor prays the following relief:

a. the Debtor asks this Court to enter an Order declaring the student loan debt to be dischargeable.

b. to designate a Christian Master to find out why the debtor has not been able to earn an income since 1982, even though possesses 10 advanced degrees;

c. to find out the murder of the beloved mother of Debtor which is nicely covered up by the jewish physicians;

d. to have discovery and documentary evidence that since 1979, because of jewish conspiracy Debtors dental conditions are not treatedand Debtor needlessly spending money on sham and make-believe treatment by the dentists.

Respectfully submitted,

Gabriel G. Atamian, MD, MSEE, JD
1021 N. State Street Apt A
Dover, DE 19901
302-678-2546
Debtor. Pro se

June 9, 2006

18

A-20

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

B

In re:                                        :
                                              :
Gabriel G. Atamian MD,MSEE,JD,                :         Case No. 05-20040 (MFW)
                                              :
            Debtor.                           :

------------------------------------------------

Gabriel G. Atamian MD,MSEE,JD,                :
                                              :
        Plaintiff,                            :
                                              :
v.                                            :         Adv. Proc. No. 06-50435 (MFW)
                                              :
U.S. Department of Education, and             :
Secretary of U.S. Department of Education,    :
and Signet Bank,                              :
                                              :
        Defendants.                           :

### ANSWER TO FIRST AMENDED COMPLAINT TO DETERMINE
### DISCHARGEABILITY OF STUDENT LOAN

The United States of America, on behalf of Defendant U.S. Department of Education and

the Secretary of Education (collectively, "Defendant"), responds to the First Amended Complaint

to Determine Dischargeability of Student Loan ("Amended Complaint") as follows:

1. Admitted.

2. Admitted that the Plaintiff owes an unsecured debt to the Defendant but denied that

the debt is owed to the National Payment Center and Defendant lacks knowledge or information

sufficient to form a belief as to the balance of the allegations in paragraph 2.

3. Defendant lacks knowledge or information sufficient to form a belief as to the truth of

A-21

these allegations and they are therefore denied.

4. Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

5. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the balance of the allegations and they are therefore denied.

6. Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

7. Paragraph 7 contains legal conclusions to which no response is required and, as to the balance of the paragraph, Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

I. Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

II. Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

III. Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

IV. Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

V. Defendant lacks knowledge or information sufficient to form a belief as to the truth of these allegations and they are therefore denied.

VI. Defendant lacks knowledge or information sufficient to form a belief as to the truth

2

A-22

of these allegations and they are therefore denied.

VII.  Defendant lacks knowledge or information sufficient to form a belief as to the truth
of these allegations and they are therefore denied.

VIII.  Defendant lacks knowledge or information sufficient to form a belief as to the truth
of these allegations and they are therefore denied.

To the extent that there are allegations not specifically contained in the numbered
paragraphs of the Amended Complaint, Defendant avers that it lacks knowledge or information
sufficient to form a belief as to the truth of these allegations and they are therefore denied.

## AFFIRMATIVE DEFENSES

A.  Plaintiff fails to state a claim for which relief may be granted.

WHEREFORE, Defendant respectfully requests that the Amended Complaint be
dismissed and that the Defendant be granted such other and further relief as the Court may deem
just and proper.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY:

Ellen W. Slights
Assistant United States Attorney
Delaware State Bar No. 2782
1007 Orange Street, Suite 700
Wilmington, DE 19899-2046

Dated: July 12, 2006

A-23

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In Re                                    :

Gabriel G. Atamian MD,MSEE,JD,           :        Case No. 05-20040 (MFW)

            Debtor.                      :

_____  :

Gabriel G. Atamian MD,MSEE,JD,           :

            Plaintiff,                   :

    v.                                   :        Adv. Pro. No. 06-50435 (MFW)

                                         :

U.S. Department of Education, and        :
Secretary of U.S. Department of Education, :
and Signet Bank, and Johns Hopkins       :
University,                              :
            Defendants.                  :


## PLAINTIFF'S INTERROGATORIES DIRECTED TO
## DEFENDANT U.S. DEPARTMENT OF EDUCATION

Pursuant to Rule of Discovery , Rule of Civil Procedure 33,

each Interrogatories shall be answered in writing under oath.

The Answers should be served within 30 days after the service of

the Interrogatories.

*Gabriel G. Atamian, MD, MSEE, JD*

Gabriel G. Atamian.MD,MSEE,JD
1021 N. State Street Apt A
Dover, DE 19901
302-678-2546
Plaintiff. Pro se !

A-24

INTERROGATORY # 1

**Labeling by Dr. Naftalin , on 1965.**

One month before my graduation from the medical school, on 1965, Dr. Naftalin who survived the German Concentration Camp(A-7) who was a psychiatrist in the medical school, coined plaintiff with the label of:"Bizarre behavior, emotionality and need of psychothe-rapy."

It is very important to note that Dr. Naftalin did not know me at all. Plaintiff has never met Dr. Naftalin .

Furthermore, in order to be graduated from New York Medical College, on 1965, plaintiff was send to the Immigration and Naturalization Department , to denounce his Syrian citizenship and acquire the status of Stateless. Plaintiff not being an "Arab", did not mind at all to be a Stateless individual. So, plaintiff did procure his green card before graduation in order to be graduated from the medical school.

Please elaborate in detail the following:

a.  Is it a fact, that jewish physician conspiracy against plaintiff was started in the medical school, on 1965?

b.  Is it a fact, that already the jewish physician conspiracy made plaintiff to procure his green card before graduation in order plaintiff to be graduated from the medical school, on 1965?

c.  If you disagree of the above Interrogatories #1(a) and (b), please give a description of each matter in which you disagree. Your description should be backed by facts?

ANSWER:

1

A-25

## INTERROGATORY # 2

### FROM 1969 to 1979, WHEN PLAINTIFF WAS IN NEW YORK CITY

On March 28, 1969, my beloved brother was killed on the Highway of Massachussetts, while plaintiff and his brother were fixing their parked car.

A jew from NYC , hit our parked car, and my brother was muti lated in that so called "Unfortunate coiencidence".

From 1970 until 1979 , plaintiff was drifted to NYC.

Jewish Physicians made a fictitious diagnosis of Lou Gueric Disease on plaintiff, on 1971. Plaintiff was literally on the Death Row, for $7\frac{1}{2}$ years, because Lou Gueric Disease is a fatal disease. The above facts are clearly described in letter send to the Board of Medicine of Virginia, on June 1, 1985. (See A-7 and A-8)

Please elaborate in detail the following:

a.  Is it a fact, that on March 28, 1969, my brother was killed by a car driven by a jew from NYC?

bb. Is it a fact, that from 1970 to 1978, the jewish physician made a fictitious diagnosis of Lou Gueric disease on plaintiff?

c.  Is it a Fact, that plaintiff was literally on the death row for $7\frac{1}{2}$ years, because Lou Gueric disease is a fatal illness?

d.  If you disagree of the above Interrogatories # 2 (a)(b) and (c), please give a description of each matter in which you disagree. Your description should be backed by facts?

ANSWER:

2

A-26

## INTERROGATORY # 3

III.    From 1979 until 1985 . THE PERIOD WHERE PLAINTIFF APPLIED
FOR LICENSE TO PRACTICE MEDICINE IN ARIZONA, DISTRICT OF COLUMBIA
AND VIRGINIA.

On June 1979, plaintiff left NYC and went to Arizona. The
Board of Medical Examiners in Arizona ordered a physical examina-
tion and a mental examination for the plaintiff, after having re-
ceived the record from Manhattan State Hospitalfor the plaintiff.

It is very ironical for the plaintiff, when the Manhattan
State Psychiatric Hospital, grants a Diploma with Honors in Psychia-
try to the plaintiff after successfully finishing the psychiatry
residency , and, and then turns around through 'unlawful act' sends
an untruthful record to the Board of Medical Examiners of Arizona,
about plaintiff. The above act, by the jewish physician from NYC,
is an overt act of conspiracy.

The same tactic happened in the District of Columbia, on
1980-81, while the plaintiff was an instructor of Physical Medicine
at Howard University Medical Center, the Department did require
for a license to practice medicine in the district of Columbia.

The plaintiff applied for the license in the district of Colum-
bia. The Board of Medical Examiners after numerous correspondance
with the State of New york, did order the plaintiff to take a
mental examination.

The same routine happened with the Board of Medical Exami-
ners of Virginia, 1985, where the Board in an informal meeting,
ordered physical and mental examination of the plaintiff. This time,
plaintiff was  aware of the conspiracy, therefore choose to surren-
der his medical license to the Board of Medical Examiners of Vir-
ginia, by his own volition, in other words, voluntarily. (See A-7 to
A-10)

3

A-27

Couple days later, after plaintiff's voluntary surrender of license, plaintiff receives a letter from New York State Licensure Department, Albany, NY. Plaintiff contacted by telephone to the sender of the letter who told plaintiff that:" Plaintiff has a license in medicine for life in New York, and plaintiff should return back to New York."

In summary, all the above orders of the mental examination of plaintiff issued by the Boards of Medical Examiners for licensure of the States of Arizona, District of Columbia and Virginia were orchestrated by the jewish physicians from the Manhattan State Hospital of the State of New York, by forwarding to the Boards untruthful record or fabricated reco rd about the plaintiff.[3]

Attached hereto is the Diploma with Honors in Psychiatry accorded to plaintiff, with special comments by Edward J. Hornick,MD, Chief of Psychiatry. (See A-73 and A-74)

Please elaborate in detail the following:

Don't you believe that as an Assistant Attorney of US , it is your duty and obligation to investigate the above matter or to refer the case to the proper authorities in the Justice Department to investigate the following:

a.  What actually did happen to plaintiff's medical license investigated by the Board of Medical Examiners of Arizona? Why the Board ordered physical examination and mental evaluation of plaintiff, on June 1980?

b.  What actually did happen to plaintiff's medical license which was investigated by the Board of Medical Examiners of the District of Columbia, on 1981? Why the Board ordered a mental examination on the plaintiff?

c.  What actually did happen to plaintiff's medical license investigated by the Board of Medical Examiners of Virginia, 1985? Why the Board ordered physical examination and mental examination of plaintiff?

4

A-28

d.   Is it a fact, that after voluntary surrender of license
     of medicine by plaintiff; couple days  later, the Licensing
     Department of the State of NY invites plaintiff on the
     telephone and states: " Plaintiff has a license to practi-
     ce medicine for life in New York?

e.   If you disagree of the above Interrogatories # 3 (a)(b)(c)
     and (d), please give a description of each matter in which
     you disagree. Your description should be backed by facts?

**ANSWER:**

A-29

## INTERROGATORY # 4

### FROM 1981 to 1995, PLAINTIFF HAS SEEN Dr. DuPONT ,
### A SPECIALIST IN BEHAVIORAL MODIFICATION MEDICINE.

Plaintiff went to Dr. DuPont [4] , on November 1981, for

his phobia and the consequences of phobia of not being able to per-

form well sexually.

From 1981 until 1985, Dr. DuPont has not kept a record

about plaintiff. But, since 1985, it is very strange , that after

the voluntary surrender of plaintiff's license of medicine,  Dr.

DuPont has kept an extensive record( including colateral records

which has nothing to do with plaintiff's phobia). Dr. DuPont has

acted as a private investigator (detective) rather than a psychia-

trist.

Dr. DuPont's record can be contrued has follows:

a. from 1981 to 1985, no record kept.
b. from 1985 to 1987, an extensive record about plaintiff is made by Dr.
DuPont. This period was when plaintiff voluntary surreder his license
and attended Maryland University for electrical engineering.
c. from 1987 to 1995, an extensive record is made, this was the period
of the cover-up of my beloved mother's murder . Dr. DuPont has tried
very hard to make plaintiff crazy (paranoid).

On August 7, 1998, plaintiff has learned through discovery,

for the first time, plaintiff has become aware and informed about

the content of Dr. DuPont's record about plaintiff.

a.   Note of Dr. DuPont on 8-9-85(See A-11)

My  name is mis-spelled: Gabrial Atamanian

the note states:

"He not practice medicine or seek to get his license back"

6

A-30

b. Note of Dr. DuPont on 6-28-85 (A-12)

My name is mis-spelled : Ataminian.

The not states;
" I also suggest  he not pursue his license in DC but that he
focus on non-clinical activities.."

c. Note of Dr. DuPont on 4-8-86 (A-13)

My name is mis-spelled: Gabrial, Atamanian.
The note states:
" I said I thought it was fine as long as he played a technical role,
not the role of the clinically repsonsible phycisiian."

It should be noted that the Notes (a), (b) and (c) , are before my beloved mother's
murder by the jewish physician on 6-1-87.

d. Note of Dr. DuPont on 8-20-87 (A-15)

" In   charge of patient relations for Adventist hospital
Said Dr. Atamian is "obviously parnaoid" and often disruptive but
that he responds to their being firm with him.
Concerned about the impact on him of the probable death of his
mother."

It is , also, very important to note that in the progress

note of plaintiff's beloved mother at Washington Adventist Hospi-

tal, on 6-19-87,the medical social worker, States (See A-14):

" Unit staff states son has 'Dx Schizophrenia.... receiving psychiatric
follow up."

e. Note of Dr. DuPont on 9-4-87 (A-16)

The note states:
"I spoke last night and this afternoon at lenght toAgt Vermillion
of the Secret service. Office 634-5100 and home 703-620-4773. He was
supportive but indicated Dr. A was not committable in his view."

Again, Dr. DuPont wanted to make me crazy(involuntary .
committable), but the Secret Service indicated that Dr. Atamian
was quite appropriately with them, and was not committable in
his view.   .

f. Note of Dr. DuPont on 1-14-90 (A-18)

The note states:
" but I told her I doubted he could get a state license in
California, or in any state."

7

A-31

g.  Note of Dr. DuPont on 7-12-91 (A-19)

Again my name is mis-spelled: Gabrael, Gargiel. **(✹)**

The note states:

" I told her I did not think he could get a license anywywhere to practice medicine."

From (a) to (g), Dr. DuPont states that plaintiff cannot practice medicine. However, please see note (h), infra.

h. Note of Dr. DuPont on 1-21-92 (A-20)

This is an interesting note which states:

" I proposed that we work to get his Maryland medial licnseback noting he'd have to drop public expressions of his antisemitism and have diagnosis of paranoia (hot phobia)

Suddenly, Dr. DuPont somehow or rather has changed his opinion , and states that plaintiff can have a license and can do clinical work. From (a) to (g) , Dr. DuPont has emphatically stated that plaintiff cannot and should not practice medicine.

Moreover, it is very interesting to notice, that Dr. DuPont is selling plaintiff the diagnosis of paranoia. Or, in a subtle manner, Dr. DuPont is forcing plaintiff to accept the diagnosis of paranoia.

Plaintiff, having a psychiatry Diploma with Honors, is suprised to see and witness such a nonprofessional conduct.

It is , also, very important to note that Dr. DuPont's note on 8-31-89(See A-17), the Dx is: DSM-III 300.02, which is chronic anxiety. Dr. DuPont in the entire encounter with the plaintiff never ever mentioned to plaintiff that plaintiff's Dx is paranoia.

(✹) It is very important to note that from the voluminous record of Dr. DuPont, in each note or approximately in each note Dr. DuPont has mis-spelled plaintiff name. Plaintiff, being himself a psychiatrist believes this is an unconcious resentment against plaintiff .

8

A-32

Please elaborate in detail the following:

a. Is it a fact, that Dr. DuPont has not kept a record of plaintiff from 1981 to 1985?

b. Is it a fact, that Dr. DuPont has kept an extensive record of plaintiff from 1985 to 1987,; the period where plaintiff surrender his license of medicine to the State of Virginia?

c. Is it a fact, that Dr. DuPont has kept an extensive record of plaintiff from 1987 to 1995,; this was the period of the cover-up of plaintiff's beloved mother's murder?

d. Is is a fact, that Dr. DuPont has tried very hard to make plaintiff crazy (paranoid, "hot phobia")?

e. Is it a fact, that Dr. DuPont wanted to make plaintiff crazy(involuntary commitment), but the Secret Service indicated that Dr. Atamian was quite appropriate with them, and was not commitable in his view?

f. Is it a fact , that from para. (a) to (g) , supra, Dr. DuPont has emphatically stated that plaintiff cannot and should not practice medicine?

g. Is it a fact, that in para. (h), note of Dr. DuPont on 1-21-92(A-20), suddenly , Dr. DuPont somehow or rather has changed his opinion, and states that plaintiff can have a license and can do clinical work?

h. Is it a fact, para. (h), that Dr. DuPont is selling plaintiff the diagnosis of paranoia?

i. Is it a fact, that Dr. DuPont's note 8-31-89(See A-17), the diagnosis is DSM:-III 300.02, which is chronic anxiety?

j. Is it a fact, that Dr. DuPont in the entire encounter with plaintiff never mentioned to plaintiff that plaintiff's diagnosis is paranoia?

k. Is it a fact, it is very important to note that from the voluminous record of Dr. DuPont, in each note or approximately in each note Dr. DuPont has mis-spelled plaintiff's name. Plaintiff being himself a psychiatrist believes this is an unconcious resentment against plaintiff?

l. If you disagree of the above Interrogatories # 4 (a) to (k), please give a description of each matter in which you disagree. Your description should be backed by facts?

**ANSWER:**

9

A-33

INTERROGATORY # 5

**THE GENESIS OF THE CONSPIRACY AGAINST PLAINTIFF BY THE JEWISH PHYSICIANS FROM NEW YORK CITY.**

Plaintiff in the Appendix A-66 to A-71, has illustrated the genesis of the conspiracy against him by the jewish physician from new york city.

Plaintiff descibes on p. A-66, how plaintiff's parents who were Armenians from Turkey, who after the massacre by the turks in 1914, plaintiff's parents immigrated to Syria. And , how his mother was raised in an orphenage in Syria by the American Protestant Missionary. The Americans came to Syria for the purpose of caring the Armenian victims of the massacre.

Plaintiff describes that when on March 19, 1956, plaintiff came to America as a student with a syrian passport. Where, during plaintiff's training in the medical school, that plaintiff was discriminated by the Jewish Physicians. They knew about my Syrian background(Citizenship). (See A-66)

Plaintiff illustrates on p. A-67, that his entire earnings from 1956 until 1999, where it reveals that plaintiff was not able to earn an income since he left New York City on 1979.

Plaintiff descibes on p. A-67, that couple days later, after plaintiff's voluntary surrender of license, plaintiff receives a letter from New York State Licensure Department, Albany, NY. Plaintiff contacted with telephone to the sender of the above letter who told plaintiff that:" Plaintiff has a license in medicine for life in New York, and that plaintiff should return back to New Yok."

10

A-34

Please elaborate in detail the following:

a.  Is it a fact, that as an Assistant Attorney of the US , it is your duty
    and obligation to investigate this matter or to refer this case to the
    proper authorities in the Justice Department to investigate why the
    plaintiff was not able to earn an income since 1982?

b.  Is it a fact, that it is very peculiar and strange not to be able to earn
    an income since 1982, where the plaintiff possesses 10 advanced degrees
    including Diplθma of Psychiatry with Honors?

c.  If you disagree of the above Interrogatories # 5 (a) and (b), please
    give a discreption of each matter in which you disagree. Your description
    should be backed by facts?

ANSWER:

A-35

## INTERROGATORY # 6

Plaintiff is a physician, electrical engineer and a lawyer. Plaintiff is a physician with three specialities :

a.  Board certified in Physical Medicine and Rehabilitation,

b.  Psychiatry with a Diploma with Honors,

c.  Also, plaintiff has done 3 years of educational training  in Cardiology at the American College of Cardiology.

In addition, plaintiff has:

| | | |
|---|---|---|
| BA | in mathemathics | 1960 |
| BS | in computer sciences | 1986 |
| MA | in chemistry | 1961 |
| MD | doctor in medicine | 1965 |
| MSEE | master in electrical engineering | 1989 |
| MS | in applied physics | 1990 |
| JD | juris doctor | 1993 |

On june 1985, I surrendered my license to practice medicine to the State of Virginia because of Jewish Conspiracy from New York for taking me for an 'Arab'.[1]

Since 1985, I earned my BS in Computer Sciences(1986) MSSE Master's in Electrical Engineering (1989) and MS in Applied Physics (1990). Needless to say that I could not find any job in Engineering because of continual Jewish Physician Conspiracy from New York State.

A-36

Please elaborate in detail the following:

a.  Is it a fact, that to practice Electrical Engineering does not require license to practice?

b.  Is it a fact, that as an Assistant Attorney of US , it is your duty or obligation to investigate the above matter, why the plaintiff was not able to find a job in Electrical Engineering, in 1990?

c.  Is it a fact, that as an Assistant Attorney of US, it is your duty and obligation to refer the above matter to the proper authorities in the Justice Department to investigate why the plaintiff could not find a job in Electrical Engineering, in 1990?

d.  If you disagree of the above Interrogatories # 6 (a) to (c), please give a description of each matter in which you disagree. Your description should be backed by facts?

**ANSWER:**

A-37

INTERROGATORY # 7

ON JUNE 1, 1987, PLAINTIFF'S BELOVED MOTHER WAS MURDERED
AT WASHINGTON ADVENTIST HOSPITAL BY A JEWISH PHYSICIAN.

Plaintiff has described, the following:

a. A-21 to A-34, in a lay person terms, the murder of his beloved mother.
b. A-35 to A-56, in somewhat medical terms , the murder of his beloved mother.
c. A-57 to A-65, plaintiff has described the spoilage of his mother medical record.


Plaintiff is adding the following citations from the medical

literature :

i.    A PHYSICIAN NEVER USES 37.5 mg  OF CAPTOPRIL ON AN ELDERLY
WOMAN OF 80 YEARS WITH CONGESTIVE HEART FAIRLURE AND DIURETICS
AND NITROPASTE ON BOARD.

1. The Report of the Joint National Committee on Detection , Evaluation,
and Treatment of High Blood Pressure, Arch. Intern. Med.- Vol. 148,
May 1988, on p.1034, states (See A85 and A-86):

" elderly Patients

ACE inhibitors( meaning captopril) are useful as
monotherapy in elderly patients."

2. Reid JL, Angiotensin converting enzyme inhibitors in the elderly,
British Medical Journal, Vol. 295, 17 Oct. 1987, states on p. 943 and
p. 944 ( See A-87 and ana A-88):

" Hypotension is most often seen in patients also taking
diuretics or in those who are hypovolemic or hyponatraemic.
Hypotension is more common in patients with cardiac failure."

"In patients with heart failure who are taking diuretics
it is rarely practcable to stop diuretics. If they cannot be
stopped then reducing the dose for 24-28 hours before giving
the angiotensin converting inhibitor may be prudent.........
Alternatively captopril 6.25 mg may be preffered because of its
shorter duration.

Again, it should be be noted that the dosage to start is 6.25 mg and not 37.5 mg which

is 6 times the dosage. And, the diuretics which in this case

is lasix should have been stopped, and not prescribed by Dr. Bass,

because my beloved mother had already received on May 31, 1987,

120 mg of lasix that day. (See A-40 and A-43)

A-38

14

3. In Primary care of the Elderly : A practical approach, states(See A-89):

> "Hence meddlesome attempts at blood pressure reduction
> may seriously threaten cerebral blood flow and decision
> to employ hypotensive therapy in person over 75 must be
> taken with extreme caution."

> "If an 80-year-old female with such symptoms is found
> to have a blood pressure of 180/100, it is most improbable
> that lowering it to 150/90 will make her more stable and,
> indeed, if postural hypotension is thereby induced, her bal-
> ance may be made much worse."

ii. WHERE PATIENT BLOODGASES INDICATES THAT AT 2l/min flow of Oxygen,
p O2 is 74 and P CO2 is 79, the flow of Oxygen should be and must
be decreased from 2 L/min. to 1 L/min, in order to prevent catastro-
phic and tragic outcome of resporatory arrest.

Citing the medical literature:

Wilkins E W, et al., MGH Textbook of EMERGENCY MEDICINE, second edition,
p. 173, states (A-90 and A -91):

> "In clinical practice, the point at which severe hypoventila-
> tion limits oxygen therapy is highly variable and requires
> a cautious trial-and-error approach monitored by arterial
> blood-gas determinations 15-20 minutes after each adjustment
> in oxygen flow."

Yet, Dr. Bass choose knowingly and deliberately to

prescribe 2 L/min. of Oxygen for 8 hours until respiratory

arrest occured to my mother. (See A-58)

Also, see A-23, A-35, A-36, A-57 and A-58 for the delibera-

te induction of respiratory arrest on my beloved mother.

iii. **DELIBERATE INDUCTION OF HYPERKILIMIA ON MY MOTHER.**

EKG on 6-1-87, at 07:00 indicates the effect of capto-

pril on serum potassium level.

The strip #5 (See A-44 and A-56) indicates hyperkalemia

meaning serumpotassium level higher than 6.5 mEq/L. ( normal

serum potassium level is 5 mEq/L). For this discussion see , also, $A-39$

A-42 to A-44).                    15

iv.    Unnecessary therapy of aminophyline I.V. to my mother
       an 80 years old woman with right sided heart failure

My mother did not have wheezing, then why treat with

aminophylline I.V. which is a bronchodialator?  (See A-45 and A-46)

Dr. Bass in his physical examination , writes:" ......

elderly woman lying comfortably in bed.........................

CHEST: No definite wheezing." (See A-47 and A-48)

ALL THE ABOVE FACTS, INDICATES THAT PLAINTIFF'S BELOVED

MOTHER WAS MUTILATED ON JUNE 1, 1987.

ALSO, IT IS VERY IMPORTANT TO NOTE THAT ON OR ABOUT 1991,

PLAINTIFF COMMUNICATED BY LETTER WITH Vincent DeQUATTRO,MD, WHO

IS MEMBER OF THE 1988 REPORT OF THE JOINT NATIONAL COMMITTEE ON

DETECTION, EVALUATION, AND TREATMENT OF HIGH BLOOD PRESSURE. (

See A-85). Dr. DeQUATTRO, WROTE TO PLAINTIFF, AND STATED:

'"IS YOUR MOTHER STILL ALIVE."

Plaese elaborate in detail the following:

a.  Is it a fact, thata physician never uses 37.5 mg of captopril on an elderly
    woman of 80 years with congestive heart failure and diuretica and nitropaste
    on board?

b.  Is it a fact, where patient blood gases indicate that at 2½/min flow of
    oxygen, P O2 is 74 and P CO2 is 79, the flow of oxygen should be and must
    be decreased from 2½/min to 1½/min inorder to prevent catastrophic and tra-
    gic outcome of resporatory arrest?

c.  Is it a fact, that an unnecessary therapy of aminophyline I.V. to my
    my mother , an 80 years old woman, with right sided heart failure,
    where my mother did not have wheezing?

A-40

16

d.  Is it a fact, that all the above facts indicate that plaintiff's beloved
    was mutilated on june 1, 1987?

e.  Is it a fact, that it is very important to note that on or about 1991,
    plaintiff communicated by letter with Dr. Vincent DeQuattro, MD , who is
    member of the 1988 report of the Joint National Committee on detection,
    evaluation and treatment of hugh blood pressure . (See A-85); where Dr.
    DeQuattro wrote to plaintiff and stated: "Is your mother still alive."?

f.  If you disagree of the above Interrogatories # 7 (a) to (e), please
    give a description of each matter in which you disagree. Your description
    should be backed by facts?

**ANSWER:**

A-41

## INTERROGATORY # 8

**Dr. ROBERT A. GORKIN(JEWISH PHYSICIAN) , LABELLED PLAINTIFF AN ANTISOCIAL CHARACTER DISORDER, MEANING A PSYCHOPATH.**

Dr. Gorkin's psychiatric evaluation (See A-83 and A-84), is an unconsented and fictitious psychiatric evaluation.

On October 12, 1995, plaintiff was hospitalized at Kent General Hospital for an acute          stomach ulcer bleeding.

On October 13, 1995, Dr. Gorkin came to plaintiff to perform a psychiatric evaluation. Plaintiff told Dr. Gorkin to 'leave plaintiff alone' and that plaintiff does not need Dr. Gorkin's services.

Dr. Gorkin's contact with plaintiff was only couple minutes.

Yet, Dr. Gorkin without having conducted a psychiatric examination and interview , without having knowledge of plaintiff's symptoms or chief complaint, without having knowledge of plaintiff's social history and past history; and without having knowledge of plaintiff's problems and without knowing 'anything' about plaintiff, has written a complete psychiatric evaluation about plaintiff, Dr. Gorkin' s diagnosis about plaintiff is antisocial character disorder(psychopath or sociopath). Again, needless to emphasis, that the contact of Dr. Gorkin with plaintiff was only approximately two minutes.(See A-83 and A-84)

Please elaborate in detail the following:

a. Is it a fact, that Dr. Gorkin psychiatric evaluation was unconsented because plaintiff told him to leave 'plaintiff alone' and that plain-does not need Dr. Gorkin's services?

b. Is it a fact, that Dr. Gorkin's contact with plaintiff was less than two minutes; then how it is possible for Dr. Gorkin to write a psychiatric evaluation and formulate a psychiatric diagnosis?

18

A-42

c. Is it a fact, that Dr. Gorkin without having conducted a psychiatric examination and interview, without having knowledge of plaintiff's symptoms and chief complaint, without having knowledge of plaintiff's social history and past history, and without having knowledge of plaintiff's problems and without knowing 'anything' about plaintiff, has written a complete psychiatric evaluation about plaintiff?

d. Is it a fact, that Dr. Gorkin's diagnosis about plaintiff is antisocial character disorder, which means psychopath or sociopath?

e. Is it a fact, that Dr. Gorkin's psychiatric diagnosis of plaintiff is a fictitious psychiatric diagnosis?

d. If you disagree of the above Interrogatories # 8 (a) to (e), please give a description of each matter in which you disagree . Your description should be backed with fa cts?

ANSWER:

A-43

INTERROGATORY # 9

DENTISTS HAVE REFUSED TO TREAT PLAINTIFF'S URGENT DENTAL PROBLEMS

(a) Since, plaintiff has left NYC, on June 1979, the New York Jewish Physician have interferred in the fabrication of plaintiff's bridge# 3,4,5.

(b) On May 24, 1999, Delaware State Dental Society and Dr. Ralston, DDS, have refused to do a Peer Review regarding the dental work done by Dr. Bahar.

(c) On July 27, 1999, Dr. Bond, DDS, after examining plaintiff's oral cavity and mouth, Dr. Bond refused to put in writing the dental findings.

(d) On July 28, 1999, Dr. Mazoch, DDS, refused to write the report about the diagnostic impression taken on plaintiff's mouth. Dr. Mazoch refused to treat plaintiff.

(e) On December 27, 2000, Dr. Chialastri, DMD, informed plaintiff that she will not treat plaintiff for teeth cleaning which was scheduled by her on January 10, 2001, at 12:00 pm.

(f) On November 28, 2000, Dr. Webster, DDS, refused to do a simple cleaning, scaling and root planning, of plaintiff's teeth. When, plaintiff arrived at Dr. Webster's office , Dr. Webster told that:"He(Dr. Webster) is not going to render any kind of treatment to plaintiff."

Dr. Mazoch's letter dated on August 10, 1999, states that:"I do not wish to treat you as a patient and would appreciate no further contact."(See A-80)

Dr. Webster extracted plaintiff's tooth#23, on or about early fall of 2000. Plaintiff paid Dr. Webster fee for extraction by the NHC card which was issued on 9-30-2000(Clinic card No.: 269380).

Dr. Webster was willing to redone all the prosthesis fabricated by Dr. Bahar, but Dr. Webster changed his mind after having received plaintiff's beloved mther medical record which does indicate beyond any doubt the murder of plaintiff's beloved mother.

A-44

20

(g)  On March 5, 2001, at 12:00 pm, plaintiff had an appoint-
ment with Dr. Jester,DDS, for oral examination and teeth cleaning.
Plaintiff arrived half an hour earlier than his appointment schedu-
led . After, having to wait one hour in Dr. Jester's office, Dr.
Jester at 1:00 o'clock, told plaintiff that :"He(Dr. Jester) is not
going to perform a preliminary examination on plaintiff's mouth,and,
also, that he is not going to perform a simple cleaning of plaintiff's
mouth and teeth."(See A-81)

(h)On April 6, 2001, Patricia M. Duca, of the Nemours Health
clinic, informed plaintiff in writing, that the clinic will not
render dental treatment to plaintiff. See A-92)

At this momoment, plaintiff introduces the waiting period
for the dnental service from the day you become a new Nemours me
member is 4-6 months(See A-6)

Plaintiff has asked numerous times from the Milford Clinic
and spoke to the manager about the waiting period, whose answer
is that : "She (managerof Milford Branch) does not know what is
happening to plaintiff's case."

Further, plaintiff has t requested , with no success, from
the Miford Clinic about the "automatically be mailed a packet shortly
after enrollment that includes the dnetal provider list for those who choose
to receive dental care through the Outreach Program. (See A-4)

The above decisions  of the defendants indicate the arbitrary and
unresasonable action by the NHC and its Officers Perry and Duca, a departure

A-45

from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached. See Arlington Heights v. Metro Housing Corp. 429 US 252, 50 L Ed 2d 450, 466, 97 S Ct 555.

i)    On 2002, Dr. Michael J. Ryan,DDS, case pending in Superior Court of Delaware, Case No.: 03C-12-038(RBY);

j)    On 2003, Dr. Anthony W. Vattilana,DDS, case pending in the Supreme Court of Delaware, Case No.: 354,2005.

k)    On 2004, Dr. Linda Nguyen, DDS, case pending in the Supreme Court of Delaware, Case No.: 595,2005;

l)    On 2004, Dr. James J. Gentile, DDS, the dentist's secretary, Ms. Shelly, stated: " That we will not tolerate Plaintiff's antisemi-tism."

m)    On 2005, refusal to treat Plaintiff's dental urgent need of dental care by DrMichael W. Martin , DDS and Dr. Christopher Burns, DDS.

n)    Also, the most important is the malicious work done by DR. Arezoo A. Bahar, DDS on Plaintiff's dentition, from 1998 to 1999.

On October 11, 2004, Dr. Christensen Affidavit (A-93 and A-94), it is  about the two x-rays taken by Dr.Bahar. Exhibit A, taken on 11/24/98(A-95) and Exhibit B, taken on 12/.16/98, after three weeks(A-95).

A-46

On October 11, 2004, Dr. Gordon J. Christensen's Affidavit, states(A-93):

> "Assuming that Exhibit A was taken on 11/24/98 and exhibit B only three weeks later, it is very peculiar that there is significant and gross tooth destruction on exhibit B ...........If this in fact occured only three weeks it would be a major undescribable phenomenon...
>
> ... however it is very peculiar situation that I have not seen before in 45 years."

As the Affidavit of Dr. Christensen states that it is very peculiar to have gross tooth destruction in three weeks, it would be a major undescribable phenomenon. The only way to explain this peculiar phenomenon , it is done by the intentional, willfull and purposeful act of Dr. Bahar by injuring and destroying the cementum and the periodontal ligament.

Please elaborate in detail the following:

a. Is it a fact that dentist have refused to eradicate and treat plaintiff's serious and urgent dental problems since 1979 until today?

b. Is it a fact, that on 2004, Dr. Gentile secretary, Ms. Shelby, stated: " That we will not tolerate plaintiff's anti-semitism."?

c. Is it a fact, about the malicious work done by Dr. Arezoo A. Bahar,DDS; where the Affidavit of Dr. Christensen states that it is very peculiar to have gross tooth destruction in three weeks, it would be a major undescri bable phenomenon?

d. Is it a fact, that the only way to explain this peculiar phenomenon described by the Affidavit of Dr. Christensen , it is done by the intentional willfull and purposeful act of Dr. Bahar by injuring and destroying the cementum and the periodontal ligament?

23

A-47

d.  If you disagree of the above Interrogatories # 9 (a) to (d) , please
    give a description of each matter in which you disagree. Your description
    should be backed with facts?

**ANSWER:**

Respectfully submitted,

Gabriel G. Atamian, MD, MSEE, JD
1021 N. State Street Apt A
Dover, De 19901
302-678-2546
Plaintiff. Pro se

A-48

24

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re                                            :

Gabriel G. Atamian MD,MSEE,JD,                  :        Case No. 05-20040 (MFW)

        Debtor.                          :

_____:

Gabriel G. Atamian MD,MSEE,JD,                  :

        Plaintiff,                       :

v.                                              :        Adv. Pro. No. 06-50435 (MFW)

U.S. Department of Education, and               :
Secretary of U.S. Department of Education,      :
and Signet Bank,                                :

        Defendants.                      :

## MOTION FOR PROTECTIVE ORDER

The United States, on behalf of its Department of Education ("DOE"), by and through its

undersigned counsel, hereby moves pursuant to Rule 26(c) of the Federal Rules of Civil

Procedure, applicable in this contested matter pursuant to Rule 7026 of the Federal Rules of

Bankruptcy Procedure, for the entry of a Protective Order prohibiting the Plaintiff from taking

discovery through the interrogatories he served on the DOE on October 6, 2006.

Under Federal Rule of Civil Procedure 26(c), the Court may make any order "which

justice requires to protect a party or person from annoyance, embarrassment, oppression, or

undue burden or expense, including one or more of the following: (1) that the ... discovery not be

had... Fed. R. Civ. Proc. 26(c). As evident from the interrogatories attached hereto as Exhibit A,

the discovery sought by the Plaintiff yields nothing relevant to adjudicating the hardship

A~49

discharge issue which is the only issue before the Court.

For the foregoing reasons, this Court should enter an Order protecting the DOE from the

wholly irrelevant discovery sought by the Plaintiff and granting such other and further relief as

the Court deems necessary and just.

COLM F. CONNOLLY
United States Attorney

BY: _____

Ellen W. Slights
Assistant United States Attorney
Delaware State Bar No. 2782
The Nemours Building
1007 Orange Street, Suite 700
Wilmington, DE 19899-2046

DATED:   November 6, 2006

$A$-50

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    )

Gabriel G. Atamian,MD,MSEE,JD             )       Chapter 7
                                          )
      Debtor.                             )       Case No.  05-20040 MFW
                                          )
_____         )
                                          )
      Plaintiff,                          )
                                          )
.v.                                       )       Adv. Proc. No.  06-50435 MFW
U.S. Department of Education; and         )
Secretary of U.S. Department of Education:)
Johns Hopkins University;                 )
Signet Bank                               )
                                          )
      Defendants                          )       Hearing date:   11/27/06 at 2:00pm


MOTION TO COMPEL INTERROGATORIES ANSWERS [1]

   The plaintiff moves to compel the defendant, Department of Education ("DOE"), the

answer of interrogatories. The defendant has not answered any of the 9 interrogatories

served by the plaintiff.

      On October 6, 2006, plaintiff propounded to the defendant a set of 9 interroga-

tories (Tab A); also, an Appendix to Plaintiff's Interrogatories, which is attached

hereto.

      On November 6, 2006, defendant responded by not answering the interrogatories.

Instead filing a motion of protective order to be presented on December 13, 2006 (Tab B).[2]

      On November 13, 2006, plaintiff files motion to compel interrogatories because

the deposition of the defendant is scheduled on December 15, 2006 ; and, the answers

to the interrogatories should be filed before that date.

_____

(1) Local Rule 7007-3, states:
            " No hearing will be scheduled on motion filed in adversary proceedings,
            ... except for discovery related motion which shall be governed by
            Local Rule 9006-1(b)."

      Local Rule 9006-1(b), states:
            " (b) Discovery- related Motions:- All motions papers under Fed.R.Bankr.P.
            7026-7037 shall be filed and served at least 5 days before the hearing."

(2)   A motion of protective order should have been filed as soon as possible
      after October 6, 2006, rather than wait one month and filed it on November 6.
      A motion of protective order should have been heard as soon as possible
      on 11/27/2006 rather than on 12/13/2006.

A-51

(3)

The bases. for the motion are as follows:

Interrogatory # 1.

Dr. Naftalin has put plaintiff's mental condition and state in issue.

Mental state is relevant on the future employment; thus rendering it to be relevant to the undue hardship.

Interrogatory # 2.

Fictitious diagnosis of Lou Gueric Disease, where plaintiff was literaly on the Death Row for $7\frac{1}{2}$ years, becuase Lou Gueric is invariably fatal illness in couple of years. Physical conditions relevant on the future employment issue; thus rendering Interrogacory # 2 to be relevant to hardship issue.

Interrogatory # 3

Licensure in medicine and past work history are relevant to claims of lost income and/or loss of employment opportunities.

Suspension and revocation of a license would be relevant, but even if inadmissible, it is discoverable if reasonably calculated to lead to dis- covery of admissible evidence.

Thus rendering Interrogatory # 3 to be relevant to undue hardship.

Interrogatory # 4

Dr. DuPont has put plaintiff's mental condition and state in issue, which is relevant on the future employment . Because of inabilty of future employment, I could not maintain a minimal standard of living , thus satisfying the undue hardship issue.

---

(3)  Rule 26 (b)(1) FRCP, made applicable to this proceeding by Bankruptcy Rule 7026, sets forth the parameters for relevancy , providing that the "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant.. .... to the claim or defense of any party."

Relevance is not the test for discovery purposes. Rather, the test is whether the discovery is reasonably calculated to lead to admissible evidence. Argus Fire & Gas, Im. Co. v. Winn, 854 So2d 829(Fla. 5th DCA 2003)

A-52

## Interrogatory # 5

Not being able to make an income since 1982 up to present is definitely relevant to undue hardship.

## Interrogatory # 6

Not being able to found a job in electrical engineering  is definitely relevant to hardship issue.

## Interrogatory # 7

This interrogatory reveals the continuation of jewish conspiracy against plaintiff. The conspiracy has devastated and ruined plaintiff's entire life. The jewish conspiracy has prevented plaintiff to find a job and employment opportunities in the future. But, even if inadmissible, it is discoverable if reasonably calculated to lead to discovery of admissible evidence.

## Interrogatory # 8

Dr. Gorkin (jewish physician) has labelled plaintiff a psychopath. Thus, Dr. Gorkin has put plaintiff's mental condition and state in issue, which relevant on the future employment.

## Interrogatory # 9

That on 2004, Dr. Gentile secretary, Ms. Shelby, stated: " That we will not tolerate plaintiff's anti-semitism?"

Moreover, Interrogatory # 9 reveals that dentists have refused to treat plaintiff's urgent and painfull dental conditions.  Just to live with painfull and swollen gums and not to be able to chew properly the food is another kind of "hardship". Further, physical conditions have relevance on the future employment.

**WHEREFORE,** the plaintiff respectfully prays that an Order be entered requiring defendant to give full and complete answers to Interrogatories # 1 to 9.

$A - 53$

3

Respecrfully submitted,

*Gabriel G. Atamian, MD, MSEE, JD*

Gabriel G. Atamian, MD,MSEE,JD
1021 N. State Street Apt A
Dover, DE 19901
302-678-2546
Plaintiff. Pro se

Dated: November 13, 2006

4

A-54

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    )

Gabriel G. Atamian,MD,MSEE,JD             )        Chapter 7
                                          )
      Debtor.                             )        Case No.   05-20040
                                          )
_____)
                                          ) .
      Plaintiff,                          )
                                          )        Adv. Proc. No.   06-50435-MFW
v.                                        )
U.S. Department of Education; and
Secretary of U.S. Department of Education:)
Johns Hopkins University;                 )
Signet Bank                               )
                                          )
      Defendants                          )        Hearing date:   11/27/06 at 2:00pm


## MOTION FOR PROTECTIVE ORDER

Plaintiff Gabriel G. Atamian,MD,MSEE,JD, do hereby moves the Hono-

rable Court pursuant to Rule 26(c) of FRCP, applicable to Rule 7026

of the Federal Rules of Bankruptcy Procedure, for the entry of

Order permitting the plaintiff to take the deposition of the Assistant

United States Attorney, Ellen W. Slights.

The bases of the motion are:

1.    Jewish conspiracy from NYC , since 1965, has ruined plaintiff's

entire life. Plaintiff has nowife, no children, no job, no money,

no savings; in other words, plaintiff has absolutely anything

except 10 advanced degrees including psychiatry diploma with honors.

2.    It is essential for the Assistant United States Attorney,

from hereon ("Attorney"), to find out what did happen to plaintiff

that he was literaly on the death row for $7\frac{1}{2}$ years , because jewish

conspiracy made a fictitious diagnosis of Lou Gueric disease which

is invariably fatal in couple years, on plaintiff on 1971.

A-55

3.    It is the duty and the obligation of the ("Attorney"), to investigate this case or to refer to the proper authorities in the Justice Department to investigate why plaintiff has not been able to earn an income since 1982.

4.    It is the duty and obligation of the ("Attorney") to find out why plaintiff surrender his medical licensure to the State of Virginia, in 1985. Couple days after the surrender of the license, plaintiff on the telephone with Licensing Department of the State of New York, where the State of New York stated: " Plaintiff has a license to practice medicine for life in New York."

5.    It is the duty and the obligation of the ("Attorney"), to investigate why plaintiff was not able to find a job in Electrical Engineering, in 1990.

6.    It is the duty and obligation of the ("Attorney") to investigate or refer to the proper authorities in the Justice Depar- ment to find that on June 1, 1987, plaintiff's beloved mother was murdered at Washington Adventist Hospital , by a jewish physician by prescribing medications in such doses that it would be fatal to any person.

7.    It is the duty and obligation of the ("Attorney") to find out that Dr. Gorkin, a jewish physician, has labelled plaintiff a psychopath.

8.    It is the duty and obligation of the ("attorney") to find out why dentists have refused to treat plaintiff's urgent and needy dental problems.

2

$A - 56$

From the above foregoings, it is essential that plaintiff
to take a deposition on the ("Attorney") in order to illustrate
and clarify the jewish conspiracy which has ruined plaintiff's
life by not letting plaintiff to have an employment; and,
also, to demonstrate that the jewish conspiracy is still alive
and harming plaintiff.

**WHEREFORE,** plaintiff prays the Honorable Court to enter an Order
permitting plaintiff to take a deposition on the Assistant United
States Attorney, Ellen W. Slight.

Respectfully submitted,

*Gabriel G. Atamian, MD, MSEE,*

Gabriel G. Atamian , MD,MSEE,JD
1021 N. State street Apt A
Dover, DE 19901
302-678-2546
Plaintiff. Pro se

November 16, 2006

3

A-57

DRAFT

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | |
| | : | |
| Gabriel G. Atamian MD,MSEE,JD, | : | Case No. 05-20040 (MFW) |
| | : | |
| Debtor. | : | |
| | : | |

| | | |
|---|---|---|
| Gabriel G. Atamian MD,MSEE,JD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Pro. No. 06-50435 (MFW) |
| | : | |
| U.S. Department of Education, and | : | |
| Secretary of U.S. Department of Education, | : | |
| and Signet Bank, | : | |
| | : | |
| Defendants. | : | |

### STIPULATION BETWEEN PLAINTIFF
### AND THE UNITED STATES

The United States, on behalf of its Department of Education ("DOE"), by and through the

undersigned attorneys, and Gabriel G. Atamian, ("Plaintiff"), appearing pro se, stipulate and

agree to the following:

**WHEREAS**, on or about July 3, 1989, the Plaintiff executed a promissory note to secure

a loan of $7,500 (Debt No. G200509000297001), on or about March 15, 1988, the Plaintiff

executed a promissory note to secure a loan of $5,000 (Debt No. G200509000297102), on or

about September 1, 1988, the Plaintiff executed a promissory note to secure a loan in the amount

of $7,500 (Loan No. G200509000297203) and on or about April 14, 1986, the Plaintiff executed

a promissory note to secure a loan in the amount of $2,500 (G200509000297304) (collectively,

A-58

DRAFT

"USA Loans"). All of the USA Loans accrued interest in the amount of 8% per annum. These USA Loans were guaranteed by USA FUNDS and then reinsured by the DOE under loan guaranty programs authorized under Title IV-B of the Higher Education Act of 1965, as amended, 20 U.S.C. 1071 et seq. (34 C.F.R., Part 682). On October 14, 2004, the USA Loans were assigned to the DOE;

**WHEREAS,** on or about February 7, 1990, the Plaintiff executed a promissory note to secure a loan of $3,000 (Debt No. N200404007938401) from John Hopkins University at 5% interest per annum ("Perkins Loan"). The institution made the loan under the federally funded National Direct Student Loan, now Perkins Student Loan, programs authorized under Title IV-E of the Higher Education Act of 1965, as amended, 20 U.S.C. Section 1087 aa et seq. (34 C.F.R. Part 674). The Perkins Loan was assigned to the DOE on August 25, 1995:

**WHEREAS**, on January 20, 2006, Plaintiff filed a Complaint, amended June 9, 2006, ("Complaint"), in this adversary proceeding seeking a hardship discharge of the USA Loans and the Perkins Loan.

**NOW THEREFORE**, it is stipulated and agreed by and between the DOE and the Plaintiff (collectively, the "parties"), subject to Bankruptcy Court approval, the following:

1.    Pursuant to 11 U.S.C. Section 523(a)(8), the parties agree that the Plaintiff is entitled to an undue hardship discharge of the Perkins Loan and the USA Loans.

2.    The parties agree that the Complaint against the United States or any officer or department thereof shall be dismissed with prejudice.

3.    This Stipulation and Order is subject to the approval of the Bankruptcy Court. If the Court declines to enter the Order, the Stipulation shall be null and void and with no force and effect.

A-59

DRAFT

4.   This Stipulation may be executed and delivered in any number of original or

facsimile counterparts, each of which shall be deemed an original, but which together shall

constitute one and the same instrument.

COLM F. CONNOLLY
United States Attorney

DATE                                    Ellen W. Slights, Delaware Bar 2782
                                        Assistant United States Attorney
                                        1007 Orange Street, Suite 700
                                        Wilmington, DE 19801
                                        (302) 573-6277

DATE                                    Gabriel G. Atamian
                                        1021 N. State Street
                                        Apartment A
                                        Dover, DE 19901
                                        (302) 678-2546

A-60



**Gordon J. Christensen**

October 11, 2004

GABRIEL G ATAMIAN MD
1021 NORTH STATE ST APT A
DOVER DE 19901

Dear Dr. Atamian,

Thank you for your request for information. I have observed both of your radiographic images.

Assuming that exhibit A was taken on 11/24/98 and exhibit B only three weeks later, it is very peculiar that there is significant and gross tooth destruction on exhibit B. Exhibit B almost appears as though it has resorption growing on the tooth structure. If this is the case it is much like the resorption of a primary [baby] tooth during its exfoliation. If this in fact occurred in only three weeks it would be a major undescribable phenomenon. Usually such resorption would require many months.

The only other possibility I can see is that the dentist has cemented the posts in exhibit B with a radiolucent cement or build-up material, which is unlikely but possible. In such case the radiograph would not show the build-up material or cement. However, that does not explain the mottled appearance of the tooth root and the widened periodontal ligament.

If you had not given me dates on the two images I would state that exhibit B must have been months later than exhibit A, since there is evidence of bone changes and tooth structure changes. If in fact the tooth with the post in it in exhibit B has this small amount of tooth structure remaining, there is no alternative but to extract it and place an implant, or a fixed bridge between the adjacent tooth to the affected tooth and the most posterior tooth.

I'm sorry not to be able to explain this phenomena better, however it is a very peculiar situation that I have not seen before in 45years. I wish you success in your oral rehabilitation.

**Director**
**Gordon J. Christensen, DDS, MSD, PhD**
3707 North Canyon Road, 3D • Provo, Utah 84604 • (801) 226-6569

A-61

Sincerely,

Gordon J. Christensen, DDS, MSD, PhD

GJC/al

A-62



Exhibit A , taken on 11/24/98.



Exhibit B, taken on 12/16/98.
• Mottled.
- Blunted Apex.

A-63



4-21-04

Exhibit C
A-64





The Office of Mental Health

The State of New York



*Certifies that*

**Gabriel At Amian, M.D.**

*has successfully completed a Program for Resident Physicians in Psychiatric Training and has satisfactorily performed the duties of Resident Psychiatrist (including Neurology) at the*

**Manhattan Psychiatric Center**

*affiliated with the College of Physicians & Surgeons of Columbia University and New York University Medical Center from* July 1, 1976 *to* June 30, 1979

*In Witness Whereof we have set our hand & Seal this* 13 *day of* Sept. 1983

_____
**Kenneth P. Kalman, M.D.**
DIRECTOR
DIRECTOR OF RESIDENT PHYSICIANS TRAINING

_____
COMMISSIONER OF MENTAL HEALTH

A-65



Ex. 15

**NEW YORK STATE**
**OFFICE OF MENTAL HEALTH**

MANHATTAN PSYCHIATRIC CENTER
MICHAEL FORD, M.D., Executive Director

WILLIAM MORRIS, M.D., Acting Commissioner

January 24, 1984

Gabriel G. Atamian, M.A., M.D.
6305 Castle Place - #3D
Falls Church, VA   22044

Dear Dr. Atamian:

Your name handwritten on your diploma is a special honor

accorded to very special residents.  I am glad you are proud of

it.

Cordially,

EJH:1rb

Edward J. Hornick, M.D.
Chief of Psychiatry

A-66

Case 8:79-cv-00368-NG    Document 06    Filed 12/17/2007    Page 69 of 69

TOTAL EARN: 1732 EARN

| YR | EARNINGS | QC | YR | EARNINGS | QC | YR | EARNINGS | QC |
|----|----------|------|----|----------|------|----|----------|------|
| 57 | 625.97 | NCCN | 73 | 14446.70 | CCCC | 89 | 2875.00 | CCCC |
| 58 | 601.49 | NCCN | 74 | 10432.15 | CCCS | 90 | 0.00 | NNNN |
| 59 | 330.13 | NCNC | 75 | 10152.00 | SSSS | 91 | 0.00 | NNNN |
| 60 | 600.00 | NNCN | 76 | 15153.00 | SSSS | 92 | 0.00 | NNNN |
| 61 | 0.00 | NNNN | 77 | 16500.85 | SSCC | 93 | 0.00 | NNNN |
| 62 | 0.00 | NNNN | 78 | 17700.00 | CCCC | 94 | 0.00 | NNNN |
| 63 | 0.00 | NNNN | 79 | 10996.13 | CCCC | 95 | 0.00 | NNNN |
| 64 | 0.00 | NNNN | 80 | 12639.39 | CCCC | 96 | 0.00 | NNNN |
| 65 | 0.00 | NNNN | 81 | 19800.00 | CCCC | 97 | 0.00 | NNNN |
| 66 | 0.00 | NNNN | 82 | 1392.00 | CCCC | 98 | 0.00 | NNNN |
| 67 | 6600.00 | SSSS | 83 | 0.00 | NNNN | 99 | 0.00 | NNNN |
| 68 | 7800.50 | SSSC | 84 | 0.00 | NNNN | | | |
| 69 | 5068.75 | CCNN | 85 | 0.00 | NNNN | | | |
| 70 | 0.00 | NNNN | 86 | 125.00 | NNNN | | | |
| 71 | 6366.35 | NNCC | 87 | 0.00 | NNNN | | | |
| 72 | 13069.15 | CCCC | 88 | 0.00 | NNNN | | | |

MAKE ANY EARNINGS AND QC CHANGES          ADDITIONAL SCREEN NEEDED (Y): N

A-67.