## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re                                              :
                                                   :
Gabriel G. Atamian MD, MSEE, JD,                   :        Case No. 05-20040 (MFW)
                                                   :
            Debtor.                                :
                                                   :
_____                :
                                                   :
Gabriel G. Atamian MD, MSEE, JD,                   :
                                                   :
            Appellant,                             :
                                                   :
    v.                                             :        Civ. No. 07-355-SLR
                                                   :
U.S. Department of Education, and                  :
Secretary of U.S. Department of Education,         :
and Signet Bank,                                   :
                                                   :
            Defendants.                            :

## APPELLEE'S ANSWERING BRIEF

COLM F. CONNOLLY
United States Attorney

Ellen W. Slights
Assistant United States Attorney
Delaware Bar I.D. No. 2782
The Nemours Building
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046
(302) 573-6277

Dated: January 18, 2008

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

APPLICABLE STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.     THE BANKRUPTCY COURT PROPERLY GRANTED SUMMARY
          JUDGMENT BECAUSE IT HAD
          NO JURISDICTION OVER THE
          RESIDUAL CLAIMS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    THE BALANCE OF THE APPELLANT'S ARGUMENTS
          WERE NOT RAISED IN HIS OBJECTION TO SUMMARY JUDGMENT . . . 7

          A.    Appellant Incorrectly Asserts in Arguments A
                and D that both the DOE's Answer and
                Settlement Proposal Were Improper  . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          B.    Appellant Avers in Arguments B and F that the
                Bankruptcy Court Decision was Premature . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Bardsley v. Judge Marjorie C. Lawrence, Court of Common*
*Pleas of Montgomery County*
    956 F. Supp. 570, 572 (E.D. Pa), aff'd, 124 F.3d 185 (3d Cir. 1997) . . . . . . . . . . . . . . . 7

*Bobroff v. Continental Bank (In re Bobroff)*
    766 F.2d 797, 802 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Celotex Corp., v. Catrett*
    477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Dowling v. City of Philadelphia*
    855 F.2d 136, 139-141 (3d.Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ernie Haire Ford, Inc. v. Ford Motor Co.*
    260 F.3d 1285, 1290 n.2 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Horowitz v. Federal Kemper Life Assurance Co.*
    57 F.3d 300, 302 n.1 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Combustion Engineering, Inc.*
    391 F.3d 190, 225 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Federal Mogul Global, Inc.*
    300 F.3d 368, 381 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Guild and Gallery Plus, Inc.*
    72 F.3d 1171 (3d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Resorts Intern., Inc.*
    372 F.3d 154, 162-163 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Siciliano*
    13 F.3d 748, 750 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**CASES**                                                                                    **PAGE**

*In re Woskob*
    305 F.3d 177, 181 (3d Cir. 2002), cert. denied, 538 U.S. 961 (2003) . . . . . . . . . . . . . . . 1

*Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*
     475 U.S. 574, 587 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*New Jersey Chamber of Commerce v. Hughtey*
     868 F.2d 621, 629 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Newark Morning Ledger Co. v. U.S.*
     539 F.2d 929, 932 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Pa. Coal Ass'n v. Babbitt*
     63 F.3d 231, 236 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Pacor, Inc. v. Higgins*
     743 F.2d 984, 994 (3d.cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Radich v. Goode*
     886 F.2d 1391, 1393 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Raymond v. U.S. Capitol Police Bd.*
     157 F.Supp.2d 50, 55 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Singleton v. Wulff*
     428 U.S. 106, 120-121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) . . . . . . . . . . . . . . . 8

*Stoe v. Flaherty*
     436 F.3d 209, 216 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Alamillo*
     941 F.2d 1085, 1086 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States Trustee v. Gryphon at Stone Mansion, Inc.*
     166 F.3d 552, 556 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**CASES**                                                                                    **PAGE**

*Woloszyn v. County of Lawrence*
     396 F.3d 314, 319 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak)*
     406 F.3d 214, 222 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Zilich v. Lucht*
     981 F.2d 694, 694 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## **STATUTES AND OTHER AUTHORITIES**

United States Bankruptcy Code
>    11 U.S.C. Section 523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

>    28 U.S.C. Section 157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rules of Bankruptcy Procedure
>    Fed. R. Bankr. P. 4007(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Federal Rules of Civil Procedure
>    Fed.R.CivP. 56(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
>    Fed.R.CivP. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## JURISDICTION

This Court has jurisdiction pursuant to 158(a)(1) of Title 28 of the United States Code.

## NATURE AND STAGE OF THE PROCEEDING

On June 5, 2007, the Appellant filed the Notice of Appeal from Bankruptcy Court appealing the May 10, 2007, Order granting the Motion for Summary Judgment filed by the United States, on behalf of its Department of Education ("DOE").

## APPLICABLE STANDARD OF REVIEW

This appeal raises a single question of law, over which this court has plenary review. New Jersey Chamber of Commerce v. Hughey, 868 F.2d 621, 629 (3d Cir. 1989). A District Court reviews a Bankruptcy Court's legal determinations de novo. Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak), 406 F.3d 214, 222 (3d Cir. 2005); In re Woskob, 305 F.3d 177, 181 (3d Cir. 2002), cert. denied, 538 U.S. 961 (2003). Any findings of fact by the Bankruptcy Court are not to be set aside unless clearly erroneous. In re Siciliano, 13 F.3d 748, 750 (3d Cir. 1994).

## SUMMARY OF ARGUMENT

The Bankruptcy Court appropriately granted the DOE's Motion for Summary Judgment where the DOE had administratively discharged the student loan debts owed by the Appellant to the DOE because the Bankruptcy Court did not have jurisdiction to decide the remaining allegations in the Appellant's First Amended Complaint which claimed that as a result of a massive Jewish conspiracy, the Appellant's mother was murdered, the Appellant was unable to earn income after 1982, and the Appellant's dental conditions were mistreated.

### STATEMENT OF FACTS

On or about July 3, 1989, the Appellant executed a promissory note to secure a loan of $7,500 (Debt No. G200509000297001).  On or about March 15, 1988, the Appellant executed a promissory note to secure a loan of $5,000 (Debt No. G200509000297102).  On or about September 1, 1988, the Appellant executed a promissory note to secure a loan in the amount of $7,500 (Loan No. G200509000297203) and on or about April 14, 1986, the Appellant executed a promissory note to secure a loan in the amount of $2,500 (G200509000297304) (collectively, "USA Loans").  All of the USA Loans accrued interest in the amount of 8% per annum. These USA Loans were guaranteed by USA FUNDS and then reinsured by the DOE under loan guaranty programs authorized under Title IV-B of the Higher Education Act of 1965, as amended, 20 U.S.C. 1071 et seq. (34 C.F.R., Part 682).  On October 14, 2004, the USA Loans were assigned to the DOE.

On or about February 7, 1990, the Appellant executed a promissory note to secure a loan of $3,000 (Debt No. N200404007938401) from John Hopkins University at 5% interest per annum ("Perkins Loan").  The institution made the loan under the federally funded National Direct Student Loan, now Perkins Student Loan, programs authorized under Title IV-E of the Higher Education Act of 1965, as amended, 20 U.S.C. Section 1087 aa et seq. (34 C.F.R. Part 674).  The Perkins Loan was assigned to the DOE on August 25, 1995.

On January 20, 2006, the Appellant initiated an adversary proceeding in Bankruptcy Court by filing the Complaint of Debtor, Gabriel G. Atamian, to Determine Dischargeability of Student Loan, which was later amended to add DOE as a party ("Complaint"), seeking: (1) a determination that the USA Loans and Perkins Loan (collectively, "Loans") were dischargeable;

and (2) alleging, among other things, that as a result of a Jewish conspiracy, the Appellant's

mother was murdered and the Appellant received faulty dental treatment. The Appellant asked

the Bankruptcy Court to find out why the Appellant had been unable to earn income since 1982,

to "find out the murder of the beloved mother", and to have discovery and documentary evidence

about the "jewish conspiracy" surrounding the dental treatment of his teeth by various dentists

("Residual Claims"). The Residual Claims were not asserted against the DOE and relief on these

claims is not obtainable from the DOE. On August 24, 2006, the DOE filed an answer to the

Complaint. After further investigation, the DOE concluded that the Appellant was entitled to an

undue hardship discharge of the Loans pursuant to 11 U.S.C. Section 523(a)(8). As a result, on

December 29, 2006, the DOE discharged the debt of the Appellant with respect to the Loans.

After the DOE administratively discharged the Appellant's DOE loans, all that was left of

the Appellant's Complaint were the Residual Claims. DOE filed a Motion for Summary

Judgment of the grounds that the Bankruptcy Court did not have jurisdiction to decide the

Residual Claims. On May 10, 2007, the Bankruptcy Court granted DOE's motion. On June 5,

2007, Appellant filed an appeal to District Court of the May 10, 2007, Order.

## ARGUMENT

## I.     THE BANKRUPTCY COURT PROPERLY GRANTED SUMMARY JUDGMENT BECAUSE IT HAD NO JURISDICTION OVER THE RESIDUAL CLAIMS.

Appellant has divided his arguments in his Opening Brief ("Brief")[1] into six parts, each

with an alphabetical designation (hereinafter referred to as Arguments A through F, respectively).

---

[1]DOE strongly objects to the shameful rants of the Appellant in every argument in the Brief. Appellant engages in malicious attacks on DOE counsel by including defamatory, scurrilous and unsubstantiated allegations against the undersigned counsel.

Arguments C and E raise similar issues and are equally meritless. These arguments allege that it is the duty of the Department of Justice to investigate the Residual Claims, including but not limited to Appellant's conspiracy theory that Jewish people are responsible for the death of his mother as well as his extensive dental problems. The arguments raised are essentially those made in Appellant's Objection to Summary Judgment where he requested that the Bankruptcy Court refer the Residual Claims to the Department of Justice for investigation.

Pursuant to the Federal Rules of Civil Procedure, a court will grant summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.CivP. 56(c). The non-moving party must present specific facts that show that there is a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Facts that could alter the outcome are material. Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). In applying this standard, the court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. Celotex Corp., v. Catrett, 477 U.S. 317, 322 (1986). To avoid summary judgment, the non moving party must present some evidence, more than a scintilla, enough that a jury could reasonably find for the non moving party. Id.; Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).

-4-

In this case there was no genuine dispute of material fact and the DOE was entitled to summary judgment as a matter of law on the basis of the undisputed facts. On December 29, 2006, the DOE voluntarily agreed to provide the relief the Debtor was seeking by administratively discharging the Debtor's obligations on the Loans. Despite this administrative discharge, the Debtor announced his intention to pursue the Residual Claims, including to "find out the murder of the beloved mother of Debtor which is nicely covered up by the jewish physicians" and "to have discovery and documentary evidence that since 1979, because of jewish conspiracy, Debtors dental conditions are not treated and Debtor needlessly spending money on sham and make-believe treatment by the dentists." (DI 29).[2]

The administrative discharge of the Loans eliminated the only claim over which the Bankruptcy Court had jurisdiction. 28 U.S.C. Section 157 confers jurisdiction on the bankruptcy court. Generally, there are four types of matters under title 11 of the bankruptcy code over which the Bankruptcy Court has jurisdiction: "(1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." Stoe v. Flaherty, 436 F.3d 209, 216 (3d Cir. 2006) (citing In re Combustion Engineering, Inc., 391 F.3d 190, 225 (3d Cir. 2005).

The Debtor's Residual Claims did not meet any of the requirements for Bankruptcy Court jurisdiction. The first subcategory of finding jurisdiction "under" Title 11 "refers merely to the bankruptcy petition itself." The Residual Claims are not part of the bankruptcy petition and thus do not fall into the first subcategory of jurisdiction. Stoe, 436 F.3d at 216. The Residual Claims

---

[2](DI_) refers to docket items listed in the Bankruptcy Court adversary proceeding (06-50435).

also fail to satisfy the "arising under" jurisdiction criteria, since they do not invoke a "substantive right provided by title 11." In re Resorts Intern., Inc., 372 F.3d 154, 162-163 (3d Cir. 2004) (citing In re Guild and Gallery Plus,Inc., 72 F.3d 1171 (3d Cir.1996)). "Arising under" jurisdiction "includes such things as administrative matters, orders to turn over property of the estate and determinations of the validity, extent, or priority of liens," and the allegations of murder and dental problems comprising the Residual Claims simply do not fall within this jurisdictional category. Stoe, 436 F.3d at 216 (quoting Collier on Bankruptcy Section 3.01(4)(c)(I) at 3-21-22 (15th Rev. Ed. 2005). The Residual Claims also do not invoke "arising in" jurisdiction. If a proceeding has no existence outside of the bankruptcy case, it "arises in" a bankruptcy case. Id. The Residual Claims of murder and dental problems exist outside of the bankruptcy case and therefore do not qualify as matters "arising in" the bankruptcy petition. United States Trustee v. Gryphon at Stone Mansion, Inc., 166 F.3d 552, 556 (3d Cir. 1999).

    To fall within the court's jurisdiction as claims 'related to' the bankruptcy filing, the claims must be of a sort that "could conceivably have any effect on the estate being administered in bankruptcy." Bobroff v. Continental Bank (In re Bobroff), 766 F.2d 797, 802 (3d Cir. 1985) (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d.cir. 1984). Claims are "related to bankruptcy if the outcome would alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." Pacor, 743 F.2d at 994. See also, In re Federal Mogul Global, Inc., 300 F.3d 368, 381 (3d Cir. 2002). The type of impact of such claims must have on the estate is that they bear directly on the bankrupt's estate and not require "the intervention of yet another lawsuit" to have an impact on the estate. Id., at 382. None of the Residual Claims

-6-

impacted upon the handling or the administration of the bankrupt estate. Thus, the Bankruptcy Court had no jurisdiction over the Residual Claims.

Even assuming that the Bankruptcy Court could have exercised its jurisdiction, the Appellant's claims still fail. In the instant case, the Bankruptcy Court was constrained to construe the complaint of pro se plaintiffs liberally. Bardsley v. Judge Marjorie C. Lawrence, Court of Common Pleas of Montgomery County, 956 F. Supp. 570, 572 (E.D. Pa), aff'd, 124 F.3d 185 (3d Cir. 1997); see also, e.g., Zilich v. Lucht, 981 F.2d 694, 694 (3d Cir. 1992). Nonetheless, even taking all allegations as true and interpreting the Complaint liberally, there were no set of facts which, if proven, would have entitled the Debtor to the relief he requested. The Federal Rules of Bankruptcy Procedure provide that "a debtor or any creditor may file a complaint to obtain a determination of the dischargeability of any debt". Fed. R. Bankr. P. 4007(a). The DOE effected an administrative discharge of the Loans on December 29, 2006. The Appellant was no longer a debtor of the DOE. Since the debt had been extinguished, there was no longer a debt to discharge or be sued upon. The Residual Claims that the Appellant was asserting were not against the DOE and no relief was obtainable from the DOE on account of such claims. Thus, there was no issue of material fact relating to the existence of a debt owing from the Appellant to the DOE and the DOE was entitled to judgment as a matter of law.

## II.    THE BALANCE OF THE APPELLANT'S ARGUMENTS WERE NOT RAISED IN HIS OBJECTION TO SUMMARY JUDGMENT

### A.    Appellant Incorrectly Asserts in Arguments A and D That Both the DOE's Answer and Settlement Proposal Were Improper

Arguments A and D in the Brief present issues which the Appellant failed to raise or address in his Objection to Motion for Summary Judgment. ( DI 77). This Court should decline

to entertain these new arguments. <u>Singleton v. Wulff</u>, 428 U.S. 106, 120-121, 96 S.Ct. 2868, 49

L.Ed.2d 826 (1976). Courts of appeal generally refuse to consider issues that are raised for the

first time on appeal. <u>Newark Morning Ledger Co. v. U.S.</u>, 539 F.2d 929, 932 (3d Cir. 1976). To

the extent the Court is inclined to consider issues raised for the first time on appeal, the

arguments put forth by Appellant are without merit. <u>United States v. Alamillo</u>, 941 F.2d 1085,

1086 (10th Cir. 1991). In Argument A of the Brief, the Appellant states that on June 9, 2006, the

Debtor filed the First Amended Complaint and on July 12, 2006, DOE filed its Answer. The

Appellant avers that the Answer does not "...answer anything at all to the pleading...". Appellant

alleges that the DOE response that it "lacked knowledge or information sufficient to form a belief

as to the truth of these allegations and they are therefore denied" is an inappropriate response to

his allegation in the Complaint that the Appellant "... was not able to earn any income since

1982, even though he does possess 10 advanced degrees". Contrary to the Appellant's

assertions, DOE's Answer meets all of the criteria set forth in the Federal Rules of Civil

Procedure.

In Argument D the Appellant raises objections to the inclusion of the paragraph " The

parties agree that the Complaint against the United States or any officer or department thereof

shall be dismissed with prejudice" in a draft of a settlement agreement proposed by the DOE. He

avers that the inclusion of this paragraph in the proposed settlement agreement constituted a

demonstration of misleading tactics, an abuse of authority and an interference with Appellant's

human rights. Appellant offers no legal authority in support of his argument. DOE contends that

the proposal of the language in the paragraph was perfectly appropriate and the Appellant was

free to refuse to sign the proposed settlement agreement, an election he ultimately made.

-8-

**B.    Appellant Avers in Arguments B and F That the Bankruptcy Court Decision Was Premature**

Arguments B and F of the Brief raise similar issues.  As with Arguments A and D, Arguments B and F were not addressed in Appellant's Objection to Motion for Summary Judgment.  In both arguments Appellant objects to the Court deciding the Motion for Summary Judgment prior to the completion of discovery.  Procedurally, the history of the discovery process in this case was tortured.  On or about October 6, 2006, the Appellant served interrogatories on the DOE.  (DI 58 and attached hereto as Exhibit A).  The interrogatories asked questions which were irrelevant and bizarre.  The Appellant asked DOE to respond to such questions as "Is it a fact that a physician never uses 37.5 mg of captopril on an elderly woman of 80 years with congestive heart failure and diuretica and nitropaste on board?".  On November 6, 2006, the DOE filed a Motion for Protective Order.  (DI 61).  On November 13, 2006, the Appellant filed a Motion to Compel Interrogatories Answers.  (DI 64).  On November 16, 2006, the Appellant noticed the deposition of the DOE and the undersigned counsel.  (DI 68).  On the same day, Appellant filed a Motion for Protective Order.  (DI 67).  On November 16, 2006, the DOE filed an Objection to Plaintiff's Motion to Compel Interrogatories.  (DI 69).  On November 21, 2006, DOE filed a Motion for Protective Order and Motion to Limit Deposition.  (DI 70).

FRCP 56(b) provides that the party against whom relief is sought may move at any time for summary judgment.  When an order granting a motion for summary judgment is attacked as premature, a District Court's refusal to delay action is reviewed for an abuse of discretion. Radich v. Goode, 886 F.2d 1391, 1393 (3d Cir. 1989).  In Dowling, the appellate court held that the District Court did not abuse its discretion when it granted summary judgment to defendants while plaintiff was still seeking additional discovery and a defendant's motion for protective

order was still outstanding.  Dowling v. City of Philadelphia, 855 F.2d 136, 139-141 (3d.Cir.

1988).  The Dowling Court reached its decision in part because the evidence the adverse party

sought "would not have precluded summary judgment".  Id. at 140.  The Bankruptcy Court in the

present case granted Summary Judgment on the legal ground that it did not have subject matter

jurisdiction over the Residual Claims and it is clear that the discovery the Appellant propounded

would not produce evidence of a genuine issue of material fact that would alter the Bankruptcy

Court's decision.  See, Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 n.2 (11th

Cir. 2001)(district court did not abuse its discretion in granting summary judgment while

discovery dispute was pending because requested discovery was unlikely to produce genuine

issue of material fact); See also, Raymond v. U.S. Capitol Police Bd., 157 F.Supp.2d 50, 55

(D.D.C. 2001) (district court granted defendant's motion for summary judgment even though

parties had not begun discovery because even if given opportunity to conduct discovery, plaintiff

would not have been able to establish prima facie case for any of her claims).  Thus, Appellant's

Arguments B and F fail.

## CONCLUSION

For the reasons stated and based upon the authorities cited herein, the DOE respectfully requests this Court deny the appeal and affirm the Bankruptcy Court Order granting summary judgment in DOE's favor.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By: Ellen W. Slights
Assistant United States Attorney
Delaware Bar I.D. No. 2782

January 18, 2008

## CERTIFICATE OF SERVICE

I, Brandi C. Everett, an employee in the Office of the United States Attorney for the

District of Delaware, hereby attest under penalty of perjury, that on January 18, 2008, a copy of

the foregoing **APPELLEE'S ANSWERING BRIEF** was served, as indicated, upon:

Gabriel G. Atamian, MD, MSEE, JD
1021 N. State Street
Apt A
Dover, DE 19901
via U.S. Mail

George L. Miller, Trustee
Suite 950
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
via U.S. Mail

/s/ Brandi C. Everett
_____
Brandi C. Everett

-12-

**ATTACHMENT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In Re                                                :

Gabriel G. Atamian MD,MSEE,JD,                       :        Case No. 05-20040 (MFW)

        Debtor.                                     :

_____                      :

Gabriel G. Atamian MD,MSEE,JD,                       :

        Plaintiff,                                  :

    v.                                               :        Adv. Pro. No. 06-50435 (MFW)

U.S. Department of Education, and                     :
Secretary of U.S. Department of Education,           :
and Signet Bank, and Johns Hopkins                   :
University,                                          :
        Defendants.                                 :

2006 OCT - 6 AM11:06
FILED
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

### PLAINTIFF'S INTERROGATORIES DIRECTED TO
### DEFENDANT U.S. DEPARTMENT OF EDUCATION

Pursuant to Rule of Discovery , Rule of Civil Procedure 33,

each Interrogatories shall be answered in writing under oath.

The Answers should be served within 30 days after the service of

the Interrogatories.

*Gabriel G. Atamian, MD, MSEE, JD*

Gabriel G. Atamian.MD, MSEE,JD
1021 N. State Street Apt A
Dover, DE 19901
302-678-2546
Plaintiff. Pro se

INTERROGATORY # 1

## Labeling by Dr. Naftalin , on 1965.

One month before my graduation from the medical school, on 1965, Dr. Naftalin who survived the German Concentration Camp(A-7) who was a psychiatrist in the medical school, coined plaintiff with the label of:"Bizarre behavior, emotionality and need of psychotherapy."

It is very important to note that Dr. Naftalin did not know me at all. Plaintiff has never met Dr. Naftalin .

Furthermore, in order to be graduated from New York Medical College, on 1965, plaintiff was send to the Immigration and Naturalization Department , to denounce his Syrian citizenship and acquire the status of Stateless. Plaintiff not being an "Arab", did not mind at all to be a Stateless individual. So, plaintiff did procure his green card before graduation in order to be graduated from the medical school.

Please elaborate in detail the following:

a.  Is it a fact, that jewish physician conspiracy against plaintiff was started in the medical school, on 1965?

b.  Is it a fact, that already the jewish physician conspiracy made plaintiff to procure his green card before graduation in order plaintiff to be graduated from the medical school, on 1965?

c.  If you disagree of the above Interrogatories #1(a) and (b), please give a description of each matter in which you disagree. Your description should be backed by facts?

ANSWER:

1

INTERROGATORY # 2

FROM 1969 to 1979, WHEN PLAINTIFF WAS IN NEW YORK CITY

On March 28, 1969, my beloved brother was killed on the
Highway of Massachussetts, while plaintiff and his brother
were fixing their parked car.

A jew from NYC , hit our parked car, and my brother was
muti lated in that so called "Unfortunate coiencidence".

From 1970 until 1979 , plaintiff was drifted to NYC.

Jewish Physicians made a fictitious diagnosis of Lou Gueric
Disease on plaintiff, on 1971. Plaintiff was literally on the Death
Row, for $7\frac{1}{2}$ years, because Lou Gueric Disease is a fatal disease.
The above facts are clearly described in letter send to the
Board of Medicine of Virginia, on June 1, 1985. (See A-7 and A-8)

Please elaborate in detail the following:

a.  Is it a fact, that on March 28, 1969, my brother was killed by a car
    driven by a jew from NYC?

bb. Is it a fact, that from 1970 to 1978, the jewish physician made a
    fictitious diagnosis of Lou Gueric disease on plaintiff?

c.  Is it a Fact, that plaintiff was literally on the death row for
    $7\frac{1}{2}$ years, because Lou Gueric disease is a fatal illness?

d.  If you disagree of the above Interrogatories # 2 (a)(b) and (c),
    please give a description of each matter in which you disagree.
    Your description should be backed by facts?

ANSWER:

2

INTERROGATORY # 3

III.  From 1979 until 1985 . THE PERIOD WHERE PLAINTIFF APPLIED FOR LICENSE TO PRACTICE MEDICINE IN ARIZONA, DISTRICT OF COLUMBIA AND VIRGINIA.

On June 1979, plaintiff left NYC and went to Arizona. The Board of Medical Examiners in Arizona ordered a physical examination and a mental examination for the plaintiff, after having received the record from Manhattan State Hospitalfor the plaintiff.

It is very ironical for the plaintiff, when the Manhattan State Psychiatric Hospital, grants a Diploma with Honors in Psychiatry to the plaintiff after successfully finishing the psychiatry residency , and, and then turns around through 'unlawful act' sends an untruthful record to the Board of Medical Examiners of Arizona, about plaintiff. The above act, by the jewish physician from NYC, is an overt act of conspiracy.

The same tactic happened in the District of Columbia, on 1980-81, while the plaintiff was an instructor of Physical Medicine at Howard University Medical Center, the Department did require for a license to practice medicine in the district of Columbia.

The plaintiff applied for the license in the district of Columbia. The Board of Medical Examiners after numerous correspondance with the State of New york, did order the plaintiff to take a mental examination.

The same routine happened with the Board of Medical Examiners of Virginia, 1985, where the Board in an informal meeting, ordered physical and mental examination of the plaintiff. This time, plaintiff was  aware of the conspiracy, therefore choose to surrender his medical license to the Board of Medical Examiners of Virginia, by his own volition, in other words, voluntarily. (See A-7 to A-10)

3

Couple days later, after plaintiff's voluntary surrender of license, plaintiff receives a letter from New York State Licensure Department, Albany, NY. Plaintiff contacted by telephone to the sender of the letter who told plaintiff that:" Plaintiff has a license in medicine for life in New York, and plaintiff should return back to New York."

In summary, all the above orders of the mental examination of plaintiff issued by the Boards of Medical Examiners for licensure of the States of Arizona, District of Columbia and Virginia were orchestrated by the jewish physicians from the Manhattan State Hospital of the State of  New York, by forwarding to the Boards untruthful record or fabricated reco rd about the plaintiff. [3]

Attached hereto is the Diploma with Honors in Psychiatry accorded to plaintiff, with special comments by Edward J. Hornick,MD, Chief of Psychiatry. (See A-73 and A-74)

Please elaborate in detail the following:

Don't you believe that as an Assistant Attorney of US , it is your duty and obligation to investigate the above matter  or to refer the case to the proper authorities in the Justice Department to investigate the following:

a.  What actually did happen to plaintiff's medical license investigated by the Board of Medical Examiners of Arizona? Why the Board ordered physical examination and mental evaluation of plaintiff, on June 1980?

b.  What actually did happen to plaintiff's medical license which was investigated by the Board of Medical Examiners of the District of Columbia, on 1981? Why the Board ordered a mental examination on the plaintiff?

c.  What actually did happen to plaintiff's medical license investigated by the Board of Medical Examiners of Virginia, 1985? Why the Board ordered physical examination and mental examination of plaintiff?

4

d.  Is it a fact, that after voluntary surrender of license
    of medicine by plaintiff; couple days  later, the Licensing
    Department of the State of NY invites plaintiff on the
    telephone and states: " Plaintiff has a license to practi-
    ce medicine for life in New York?

e.  If you disagree of the above Interrogatories # 3 (a)(b)(c)
    and (d), please give a description of each matter in which
    you disagree. Your description should be backed by facts?

**ANSWER:**

INTERROGATORY # 4

FROM 1981 to 1995, PLAINTIFF HAS SEEN Dr. DuPONT ,
A SPECIALIST IN BEHAVIORAL MODIFICATION MEDICINE.

Plaintiff went to Dr. DuPont [4] , on November 1981, for
his phobia and the consequences of phobia of not being able to per-
form well sexually.

From 1981 until 1985, Dr. DuPont has not kept a record
about plaintiff. But, since 1985, it is very strange , that after
the voluntary surrender of plaintiff's license of medicine,  Dr.
DuPont has kept an extensive record( including colateral records
which has nothing to do with plaintiff's phobia). Dr. DuPont has
acted as a private investigator (detective) rather than a psychia-
trist.

Dr. DuPont's record can be contrued has follows:

a. from 1981 to 1985, no record kept.
b. from 1985 to 1987, an extensive record about plaintiff is made by Dr.
DuPont. This period was when plaintiff voluntary surreder his license
and attended Maryland University for electrical engineering.
c. from 1987 to 1995, an extensive record is made, this was the period
of the cover-up of my beloved mother's murder . Dr. DuPont has tried
very hard to make plaintiff crazy (paranoid).

On August 7, 1998, plaintiff has learned through discovery,
for the first time, plaintiff has become aware and informed about
the content of Dr. DuPont's record about plaintiff.

a.  Note of Dr. DuPont on 8-9-85(See A-11)

My  name is mis-spelled: Gabrial Atamanian

the note states:

"He not practice medicine or seek to get his license back"

6

b. Note of Dr. DuPont on 6-28-85 (A-12)

My name is mis-spelled : Ataminian.

The not states;
" I also suggest  he not pursue his license in DC but that he focus on non-clinical activities.."

c. Note of Dr. DuPont on 4-8-86 (A-13)

My name is mis-spelled: Gabrial, Atamanian.
The note states:
" I said I thought it was fine as long as he played a technical role, not the role of the clinically repsonsible phycisiian."

It should be noted that the Notes (a), (b) and (c) , are before my beloved mother's murder by the jewish physician on 6-1-87.

d. Note of Dr. DuPont on 8-20-87 (A-15)

" In   charge of patient relations for Adventist hospital
Said Dr. Atamian is "obviously parnaoid" and often disruptive but that he responds to their being firm with him.
Concerned about the impact on him of the probable death of his mother."

It is , also, very important to note that in the progress

note of plaintiff's beloved mother at Washington Adventist Hospi-

tal, on 6-19-87,the medical social worker, States (See A-14):

" Unit staff states son has Dx Schizophrenia.... receiving psychiatric follow up."

e. Note of Dr. DuPont on 9-4-87 (A-16)

The note states:
"I spoke last night and this afternoon at lenght toAgt Vermillion of the Secret service. Office 634-5100 and home 703-620-4773. He was supportive but indicated Dr. A was not committable in his view."

Again, Dr. DuPont wanted to make me crazy(involuntary committable), but the Secret Service indicated that Dr. Atamian was quite appropriately with them, and was not committable in his view.

f. Note of Dr. DuPont on 1-14-90 (A-18)

The note states:
" but I told her I doubted he could get a state license in California, or in any state."

g.  Note of Dr. DuPont on 7-12-91 (A-19)

Again my name is mis-spelled: Gabrael, Gargiel. (*)

The note states:

" I told her I did not think he could get a license anywhere to practice medicine."

From (a) to (g), Dr. DuPont states that plaintiff cannot practice medicine. However, please see note (h), infra.

h. Note of Dr. DuPont on 1-21-92 (A-20)

This is an interesting note which states:

" I proposed that we work to get his Maryland medial licnseback  ; noting he'd have to drop public expressions of his antisemitism and have diagnosis of paranoia (hot phobia)

Suddenly, Dr. DuPont somehow or rather has changed his opinion , and states that plaintiff can have a license and can do clinical work. From (a) to (g) , Dr. DuPont has emphatically stated that plaintiff cannot and should not practice medicine.

Moreover, it is very interesting to notice, that Dr. DuPont is selling plaintiff the diagnosis of paranoia. Or, in a subtle manner, Dr. DuPont is forcing plaintiff to accept the diagnosis of paranoia.

Plaintiff, having a psychiatry Diploma with Honors, is suprised to see and witness such a  nonprofessional conduct.

It is , also, very important to note that Dr. DuPont's note on 8-31-89(See A-17), the Dx is: DSM-III 300.02, which is chronic anxiety. Dr. DuPont in the entire encounter with the plain-tiff never ever mentioned to plaintiff that plaintiff's Dx is paranoia.

(*) It is very important to note that from the voluminous record of Dr. DuPont, in each note or approximately in each note Dr. DuPont has mis-spelled plaintiff name. Plaintiff, being himself a psychiatrist believes this is an unconcious resentment against plaintiff .

8

Please elaborate in detail the following:

a. Is it a fact, that Dr. DuPont has not kept a record of plaintiff from 1981 to 1985?

b. Is it a fact, that Dr. DuPont has kept an extensive record of plaintiff from 1985 to 1987,; the period where plaintiff surrender his license of medicine to the State of Virginia?

c. Is it a fact, that Dr. DuPont has kept an extensive record of plaintiff from 1987 to 1995,; this was the period of the cover-up of plaintiff's beloved mother's murder?

d. Is is a fact, that Dr. DuPont has tried very hard to make plaintiff crazy (paranoid, "hot phobia")?

e. Is it a fact, that Dr. DuPont wanted to make plaintiff crazy(involuntary commitment), but the Secret Service indicated that Dr. Atamian was quite appropriate with them, and was not commitable in his view?

f. Is it a fact , that from para. (a) to (g) , supra, Dr. DuPont has emphatically stated that plaintiff cannot and should not practice medicine?

g. Is it a fact, that in para. (h), note of Dr. DuPont on 1-21-92(A-20), suddenly , Dr. DuPont somehow or rather has changed his opinion, and states that plaintiff can have a license and can do clinical work?

h. Is it a fact, para. (h), that Dr. DuPont is selling plaintiff the diagnosis of paranoia?

i. Is it a fact, that Dr. DuPont's note 8-31-89(See A-17), the diagnosis is DSM:-III 300.02, which is chronic anxiety?

j. Is it a fact, that Dr. DuPont in the entire encounter with plaintiff never mentioned to plaintiff that plaintiff's diagnosis is paranoia?

k. Is it a fact, it is very important to note that from the voluminous record of Dr. DuPont, in each note or approximately in each note Dr. DuPont has mis-spelled plaintiff's name. Plaintiff being himself a psychiatrist believes this is an unconcious resentment against plaintiff?

l. If you disagree of the above Interrogatories # 4 (a) to (k), please give a description of each matter in which you disagree. Your description should be backed by facts?

**ANSWER:**

9

## INTERROGATORY # 5

### THE GENESIS OF THE CONSPIRACY AGAINST PLAINTIFF BY THE JEWISH PHYSICIANS FROM NEW YORK CITY.

Plaintiff in the Appendix A-66 to A-71, has illustrated the genesis of the conspiracy against him by the jewish physician from new york city.

Plaintiff descibes on p. A-66, how plaintiff's parents who were Armenians from Turkey, who after the massacre by the turks in 1914, plaintiff's parents immigrated to Syria. And , how his mother was raised in an orphanage in Syria by the American Protestant Missionary. The Americans came to Syria for the purpose of caring the Armenian victims of the massacre.

Plaintiff describes that when on March 19, 1956, plaintiff came to America as a student with a syrian passport. Where, during plaintiff's training in the medical school, that plaintiff was discriminated by the Jewish Physicians. They knew about my Syrian background(Citizenship). (See A-66)

Plaintiff illustrates on p. A-67, that his entire earnings from 1956 until 1999, where it reveals that plaintiff was not able to earn an income since he left New York City on 1979.

Plaintiff descibes on p. A-67, that couple days later, after plaintiff's voluntary surrender of license, plaintiff receives a letter from New York State Licensure Department, Albany, NY. Plaintiff contacted with telephone to the sender of the above letter who told plaintiff that:" Plaintiff has a license in medicine for life in New York, and that plaintiff should return back to New Yok."

10

Please elaborate in detail the following:

a.  Is it a fact, that as an Assistant Attorney of the US , it is your duty
    and obligation to investigate this matter or to refer this case to the
    proper authorities in the Justice Department to investigate why the
    plaintiff was not able to earn an income since 1982?

b.  Is it a fact, that it is very peculiar and strange not to be able to earn
    an income since 1982, where the plaintiff possesses 10 advanced degrees
    including Diploma of Psychiatry with Honors?

c.  If you disagree of the above Interrogatories # 5 (a) and (b), please
    give a discreption of each matter in which you disagree. Your description
    should be backed by facts?


ANSWER:

INTERROGATORY # 6

Plaintiff is a physician, electrical engineer and a lawyer. Plaintiff is a physician with three specialities :

    a.  Board certified in Physical Medicine and Rehabilitation,

    b.  Psychiatry with a Diploma with Honors,

    c.  Also, plaintiff has done 3 years of educational training in Cardiology at the American College of Cardiology.

In addition, plaintiff has:

| | | |
|---|---|---|
| BA | in mathemathics | 1960 |
| BS | in computer sciences | 1986 |
| MA | in chemistry | 1961 |
| MD | doctor in medicine | 1965 |
| MSEE | master in electrical engineering | 1989 |
| MS | in applied physics | 1990 |
| JD | juris doctor | 1993 |

On june 1985, I surrendered my license to practice medicine to the State of Virginia because of Jewish Conspiracy from New York for taking me for an 'Arab'. [1]

Since 1985, I earned my BS in Computer Sciences(1986) MSSE Master's in Electrical Engineering (1989) and MS in Applied Physics (1990). Needless to say that I could not find any job in Engineering because of continual Jewish Physician Conspiracy from New York State.

12

Please elaborate in detail the following:

a.  Is it a fact, that to practice Electrical Engineering does not require
    license to practice?

b.  Is it a fact, that as an Assistant Attorney of US , it is your duty
    or obligation to investigate the above matter, why the plaintiff
    was not able to find a job in Electrical Engineering, in 1990?

c.  Is it a fact, that as an Assistant Attorney of US, it is your duty and
    obligation to refer the above matter to the proper authorities in the
    Justice Department to investigate why the plaintiff could not find a job
    in Electrical Engineering, in 1990?

d.  If you disagree of the above Interrogatories # 6 (a) to (c), please
    give a description of each matter in which you disagree. Your description
    should be backed by facts?

ANSWER:

INTERROGATORY # 7

ON JUNE 1, 1987, PLAINTIFF'S BELOVED MOTHER WAS MURDERED AT WASHINGTON ADVENTIST HOSPITAL BY A JEWISH PHYSICIAN.

Plaintiff has described, the following:

a. A-21 to A-34, in a lay person terms, the murder of his beloved mother.
b. A-35 to A-56, in somewhat medical terms , the murder of his beloved mother.
c. A-57 to A-65, plaintiff has described the spoilage of his mother medical record.

Plaintiff is adding the following citations from the medical literature :

i.    A PHYSICIAN NEVER USES 37.5 mg  OF CAPTOPRIL ON AN ELDERLY WOMAN OF 80 YEARS WITH CONGESTIVE HEART FAIRLURE AND DIURETICS AND NITROPASTE ON BOARD.

1. The Report of the Joint National Committee on Detection , Evaluation, and Treatment of High Blood Pressure, Arch. Intern. Med.- Vol. 148, May 1988, on p.1034, states (See A85 and A-86):

    " elderly Patients

    ACE inhibitors( meaning captopril) are useful as monotherapy in elderly patients."

2. Reid Jl, Angiotensin converting enzyme inhibitors in the elderly, British Medical Journal, Vol. 295, 17 Oct. 1987, states on p. 943 and p. 944 ( See A-87 and ana A-88):

    " Hypotension is most often seen in patients also taking diuretics or in those who are hypovolemic or hyponatraemic. Hypotension is more common in patients with cardiac failure."

    "In patients with heart failure who are taking diuretics it is rarely practable to stop diuretics. If they cannot be stopped then reducing the dose for 24-28 hours before giving the angiotensin converting inhibitor may be prudent......... Alternatively captopril 6.25 mg may be preffered because of its shorter duration.

Again, it should bve be noted that the dosage to start is 6.25 mg and not 37.5 mg which is 6 times the dosage. And, the diuretics which in this case is lasix should have been stopped, and not prescribed by Dr. Bass, because my beloved mother had already received on May 31, 1987, 120 mg of lasix that day. (See A-40 and A-43)

14

3. <u>In Primary care of the Elderly</u> : A practical approach, states(See A-89):

> "Hence meddlesome attempts at blood pressure reduction may seriously threaten cerebral blood flow and decision to employ hypotensive therapy in person over 75 must be taken with extreme caution."

> "If an 80-year-old female with such symptoms is found to have a blood pressure of 180/100, it is most improbable that lowering it to 150/90 will make her more stable and, indeed, if postural hypotension is thereby induced, her balance may be made much worse."

ii.    WHERE PATIENT BLOODGASES INDICATES THAT AT 2L/min flow of Oxygen, p O2 is 74 and P CO2 is 79, the flow of Oxygen should be and must be decreased from 2 L/min. to 1 L/min, in order to prevent catastrophic and tragic outcome of resporatory arrest.

Citing the medical literature:

Wilkins E W, et al., <u>MGH Textbook of EMERGENCY MEDICINE,</u> second edition, p. 173, states (A-90 and A -91) :

> "In clinical practice, the point at which severe hypoventilation limits oxygen therapy is highly variable and requires a cautious trial-and-error approach monitored by arterial blood-gas determinations 15-20 minutes after each adjustment in oxygen flow."

Yet, Dr. Bass choose knowingly and deliberately to prescribe 2 L/min. of Oxygen for 8 hours until respiratory arrest occured to my mother. (See A-58)

Also, see A-23, A-35, A-36, A-57 and A-58 for the deliberate induction of respiratory arrest on my beloved mother.

iii.    DELIBERATE INDUCTION OF HYPERKILIMIA ON MY MOTHER.

EKG on 6-1-87, at 07:00 indicates the effect of captopril on serum potassium level.

The strip #5 (See A-44 and A-56) indicates hyperkalemia meaning serumpotassium level higher than 6.5 mEq/L. ( normal serum potassium level is 5 mEq/L). For this discussion see , also, A-42 to A-44).

15

iv.    Unnecessary therapy of aminophyline I.V. to my mother
an 80 years old woman with right sided heart failure


My mother did not have wheezing, then why treat with

aminophylline I.V. which is a bronchodialator?  (See A-45 and A-46)

Dr. Bass in his physical examination , writes:" ......

elderly woman lying comfortably in bed......................

CHEST: No definite wheezing." (See A-47 and A-48)


ALL THE ABOVE FACTS, INDICATES THAT PLAINTIFF'S BELOVED

MOTHER WAS MUTILATED ON JUNE 1, 1987.

ALSO, IT IS VERY IMPORTANT TO NOTE THAT ON OR ABOUT 1991,

PLAINTIFF COMMUNICATED BY LETTER WITH Vincent DeQUATTRO,MD, WHO

IS MEMBER OF THE 1988 REPORT OF THE JOINT NATIONAL COMMITTEE ON

DETECTION, EVALUATION, AND TREATMENT OF HIGH BLOOD PRESSURE. (

See A-85). Dr. DeQUATTRO, WROTE TO PLAINTIFF, AND STATED:

'"IS YOUR MOTHER STILL ALIVE."


Plaese elaborate in detail the following:

a.  Is it a fact, thata physician never uses 37.5 mg of captopril on an elderly
woman of 80 years with congestive heart failure and diuretica and nitropaste
on board?

b.  Is it a fact, where patient blood gases indicate that at 2½/min flow of
oxygen, P O2 is 74 and P CO2 is 79, the flow of oxygen should be and must
be decreased from 2½/min to 1½/min inorder to prevent catastrophic and tra-
gic outcome of resporatory arrest?

c.  Is it a fact, that an unnecessary therapy of aminophyline I.V. to my
my mother , an 80 years old woman, with right sided heart failure,
where my mother did not have wheezing?

d.  Is it a fact, that all the above facts indicate that plaintiff's beloved
    was mutilated on june 1, 1987?

e.  Is it a fact, that it is very important to note that on or about 1991,
    plaintiff communicated by letter with Dr. Vincent DeQuattro, MD , who is
    member of the 1988 report of the Joint National Committee on detection,
    evaluation and treatment of hugh blood pressure . (See A-85); where Dr.
    DeQuattro wrote to plaintiff and stated: "Is your mother still alive."?

f.  If you disagree of the above Interrogatories # 7 (a) to (e), please
    give a description of each matter in which you disagree. Your description
    should be backed by facts?


**ANSWER:**

## INTERROGATORY # 8

Dr. ROBERT A. GORKIN(JEWISH PHYSICIAN) , LABELLED PLAINTIFF AN ANTISOCIAL CHARACTER DISORDER, MEANING A PSYCHOPATH.

Dr. Gorkin's psychiatric evaluation (See A-83 and A-84), is an unconsented and fictitious psychiatric evaluation.

On October 12, 1995, plaintiff was hospitalized at Kent General Hospital for an acute                    stomach ulcer bleeding.

On October 13, 1995, Dr. Gorkin came to plaintiff to perform a psychiatric evaluation. Plaintiff told Dr. Gorkin to 'leave plaintiff alone' and that plaintiff does not need Dr. Gorkin's services.

Dr. Gorkin's contact with plaintiff was only couple minutes.

Yet, Dr. Gorkin without having conducted a psychiatric examination and interview , without having knowledge of plaintiff's symptoms or chief complaint, without having knowledge of plaintiff's social history and past history; and without having knowledge of plaintiff's problems and without knowing 'anything' about plaintiff, has written a complete psychiatric evaluation about plaintiff, Dr. Gorkin's diagnosis about plaintiff is antisocial character disorder(psychopath or sociopath). Again, needless to emphasis, that the contact of Dr. Gorkin with plaintiff was only approximately two minutes.(See A-83 and A-84)

Please elaborate in detail the following:

a.  Is it a fact, that Dr. Gorkin psychiatric evaluation was unconsented because plaintiff told him to leave 'plaintiff alone' and that plain-does not need Dr. Gorkin's services?

b.  Is it a fact, that Dr. Gorkin's contact with plaintiff was less than two minutes; then how it is possible for Dr. Gorkin to write a psychiatric evaluation and formulate a psychiatric diagnosis?

18

c.   Is it a fact, that Dr. Gorkin without having conducted a psychiatric
     examination and interview, without having knowledge of plaintiff's
     symptoms and chief complaint, without having knowledge of plaintiff's
     social history and past history, and without having knowledge of
     plaintiff's problems and without knowing 'anything' about plaintiff,
     has written a complete psychiatric evaluation about plaintiff?

d.   Is it a fact, that Dr. Gorkin's diagnosis about plaintiff is antisocial
     character disorder, which means psychopath or sociopath?

e.   Is it a fact, that Dr. Gorkin's psychiatric diagnosis of plaintiff
     is a fictitious psychiatric diagnosis?

d.   If you disagree of the above Interrogatories # 8 (a) to (e), please
     give a description of each matter in which you disagree . Your
     description should be backed with fa cts?


ANSWER:

19

INTERROGATORY # 9

DENTISTS HAVE REFUSED TO TREAT PLAINTIFF'S URGENT DENTAL PROBLEMS

(a) Since, plaintiff has left NYC, on June 1979, the New York Jewish Physician have interferred in the fabrication of plaintiff's bridge# 3,4,5.

(b) On May 24, 1999, Delaware State Dental Society and Dr. Ralston, DDS, have refused to do a Peer Review regarding the dental work done by Dr. Bahar.

(c) On July 27, 1999, Dr. Bond, DDS, after examining plaintiff's oral cavity and mouth, Dr. Bond refused to put in writing the dental findings.

(d) On July 28, 1999, Dr. Mazoch, DDS, refused to write the report about the diagnostic impression taken on plaintiff's mouth. Dr. Mazoch refused to treat plaintiff.

(e) On December 27, 2000, Dr. Chialastri, DMD, informed plaintiff that she will not treat plaintiff for teeth cleaning which was scheduled by her on January 10, 2001, at 12:00 pm.

(f) On November 28, 2000, Dr. Webster, DDS, refused to do a simple cleaning, scaling and root planning, of plaintiff's teeth. When, plaintiff arrived at Dr. Webster's office , Dr. Webster told that:"He(Dr. Webster) is not going to render any kind of treatment to plaintiff."

---

Dr. Mazoch's letter dated on August 10, 1999, states that:"I do not wish to treat you as a patient and would appreciate no further contact."(See A-80)

Dr. Webster extracted plaintiff's tooth#23, on or about early fall of 2000. Plaintiff paid Dr. Webster fee for extraction by the NHC card which was issued on 9-30-2000(Clinic card No.: 269380)

Dr. Webster was willing to redone all the prosthesis fabricated by Dr. Bahar, but Dr. Webster changed his mind after having received plaintiff's beloved mther medical record which does indicate beyond any doubt the murder of plaintiff's beloved mother.

(g)  On March 5, 2001, at 12:00 pm, plaintiff had an appointment with Dr. Jester, DDS, for oral examination and teeth cleaning. Plaintiff arrived half an hour earlier than his appointment scheduled . After, having to wait one hour in Dr. Jester's office, Dr. Jester at 1:00 o'clock, told plaintiff that :"He(Dr. Jester) is not going to perform a preliminary examination on plaintiff's mouth, and, also, that he is not going to perform a simple cleaning of plaintiff's mouth and teeth."(See A-81)


(h)On April 6, 2001, Patricia M. Duca, of the Nemours Health clinic, informed plaintiff in writing, that the clinic will not render dental treatment to plaintiff. See A-92)

At this momoment, plaintiff introduces the waiting period for the dnental service from the day you become a new Nemours me member is 4-6 months(See A-6)

Plaintiff has asked numerous times from the Milford Clinic and spoke to the manager about the waiting period, whose answer is that : "She (managerof Milford Branch) does not know what is happening to plaintiff's case."

Further, plaintiff has t requested , with no success, from the Miford Clinic about the "automatically be mailed a packet shortly after enrollment that includes the dnetal provider list for those who choose to receive dental care through the Outreach Program. (See A-4)

The above decisions  of the defendants indicate the arbitrary and unresasonable action by the NHC and its Officers Perry and Duca, a departure

21

from the normal procedural sequence also might afford evidence

that improper purposes are playing a role. Substantive departures

too may be relevant particularly if the factors usually considered

important by the decisionmaker strongly favor a decision contrary

to the one reached. See Arlington Heights v. Metro Housing Corp.

429 US 252, 50 L Ed 2d 450, 466, 97 S Ct 555.

  i)    On 2002, Dr. Michael J. Ryan,DDS, case pending in Superior

Court of Delaware, Case No.: 03C-12-038(RBY);

  j)    On 2003, Dr. Anthony W. Vattilana,DDS, case pending in the

Supreme Court of Delaware, Case No.: 354,2005.

  k)    On 2004, Dr. Linda Nguyen, DDS, case pending in the Supreme

Court of Delaware, Case No.: 595,2005;

  l)    On 2004, Dr. James J. Gentile, DDS, the dentist's secretary,

Ms. Shelly, stated: " That we will not tolerate Plaintiff's antisemi-

tism."

  m)    On 2005, refusal to treat Plaintiff's dental urgent need

of dental care by DrMichael W. Martin , DDS and Dr. Christopher

Burns, DDS.

  n)    Also, the most important is the malicious work done by DR.

Arezoo A. Bahar, DDS on Plaintiff's dentition, from 1998 to 1999.

  On October 11, 2004, Dr. Christensen Affidavit (A-93 and A-94),

it is  about the two x-rays taken by Dr.Bahar. Exhibit A,

taken on 11/24/98(A-95) and Exhibit B, taken on 12/.16/98, after

three weeks(A-95).

On October 11, 2004, Dr. Gordon J. Christensen's Affidavit,

states(A-93):

> "Assuming that Exhibit A was taken on 11/24/98 and
> exhibit B only three weeks later, it is very pecu-
> liar that there is significant and gross tooth des-
> truction on exhibit B ..........If this in fact
> occured only three weeks it would be a major undes-
> cribable phenomenon...
>
> ...however it is very peculiar situation that
> I have not seen before in 45 years."

As the Affidavit of Dr. Christensen states that it is very pecu-

liar to have gross tooth destruction in three weeks, it would be

a major undescribable phenomenon.  The only way to explain this

peculiar phenomenon , it is done by the intentional, willfull

and purposeful act of Dr. Bahar by injuring and destroying the

cementum and the periodontal ligament.

Please elaborate in detail the following:

a.  Is it a fact that dentist have refused to eradicate and treat plaintiff's
    serious and urgent dental problems since 1979 until today?

b.  Is it a fact, that on 2004, Dr. Gentile secretary, Ms. Shelby, stated:
    " That we will not tolerate plaintiff's anti-semitism."?

c.  Is it a fact, about the malicious work done by Dr. Arezoo A. Bahar,DDS;
    where the Affidavit of Dr. Christensen states that it is very peculiar
    to have gross tooth destruction in three weeks, it would be a major
    undescri bable phenomenon?

d.  Is it a fact, that the only way to explain this peculiar phenomenon
    described by the Affidavit of Dr. Christensen , it is done by the intentional
    willfull and purposeful act of Dr. Bahar by injuring and destroying the
    cementum and the periodontal ligament?

23

d.  If you disagree of the above Interrogatories # 9 (a) to (d) , please
    give a description of each matter in which you disagree. Your description
    should be backed with facts?


**ANSWER:**


Respectfully submitted,

*Gabriel G. Atamian, MD, MSE*

*JD*

Gabriel G. Atamian,MD,MSEE,JD
1021 N. State Street Apt A
Dover, De 19901
302-678-2546
Plaintiff. Pro se